HIDY MOTORS, INC., Appellee,

v.

SHEAFFER et al., Appellants.

[Cite as *Hidy Motors, Inc. v. Sheaffer*, 183 Ohio App.3d 316, 2009-Ohio-3763.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 08–CA–33.

Decided July 31, 2009.

318

Maribeth Deavers, Mark H. Troutman, and James M. Hill, for appellee.

Jeffrey Silverstein and Jason Matthews, for appellants.

GRADY, Judge.

{¶ 1} Defendants, Gary Sheaffer and Jason Sutton, appeal from orders denying their motions for summary judgment and granting partial summary judgment for plaintiff, Hidy Motors, Inc. ("Hidy"), on Sheaffer and Sutton's counterclaims arising from their former employment by Hidy.

{¶ 2} Hidy is an automobile dealership. Hidy hired Sheaffer to work as a car salesman in November 2005. At that time, Sheaffer was 67 years old. Hidy hired Sutton to work as a car salesman in January 2006.

{¶ 3} Sheaffer and Sutton each signed Hidy's employee noncompetition and confidentiality agreement when they were hired. The agreement prohibits employees from directly or indirectly competing with the business in which Hidy is engaged for two years following termination of their employment by Hidy. Matt Castrucci's Auto Mall in Dayton is specifically identified in the agreement as one of the businesses in competition with Hidy for which former employees cannot work.

{¶ 4} Sheaffer quickly became one of Hidy's top salespersons. On March 15, 2006, Sheaffer quit his employment at Hidy and accepted a position as general sales manager at Joseph Airport Toyota. Sheaffer worked for Joseph Airport Toyota for approximately two months before he was terminated following a disagreement with company management. Tim Bell, Hidy's general sales manager, then contacted Sheaffer and offered him an opportunity to return to employ-

ment at Hidy as a new-car salesman, on terms the same as Sheaffer's prior employment.

{¶ 5} Sheaffer accepted Bell's offer and returned to Hidy on May 5, 2006. Sheaffer did not sign Hidy's noncompetition agreement when he began this second period of employment. The pay structure was the same as his prior employment with Hidy, but Bell assigned Sheaffer to the least desirable sales desk in the showroom. Sheaffer also lost all of his seniority that would permit him to receive more-favorable job assignments at Hidy. Further, Sheaffer had to reapply and wait to requalify for all of his fringe benefits.

{¶ 6} According to Sheaffer, Bell began harassing Sheaffer because of his age shortly after Sheaffer returned to Hidy, and he continued to do so until Sheaffer resigned almost a year later on April 30, 2007. Sheaffer contends that he resigned because of the age harassment. Hidy disagrees, and argues that Sheaffer resigned solely to seek what he believed to be a better sales opportunity at Matt Castrucci's Auto Mall.

{¶ 7} Sheaffer began working for Matt Castrucci's Auto Mall on May 1, 2007. Sutton also accepted a job with Matt Castrucci's Auto Mall. Joe Hidy, the dealership manager at Hidy, telephoned Matt Castrucci shortly thereafter and complained that Sheaffer and Sutton had signed noncompetition agreements with Hidy. As a result of that telephone conversation, Matt Castrucci fired both Sheaffer and Sutton.

{¶ 8} On May 7, 2007, Hidy filed a complaint for declaratory judgment, seeking a declaration that the two-year noncompetition agreements signed by Sheaffer in November 2005 and Sutton in January 2006 are enforceable and legally binding. Sheaffer filed an answer and a counterclaim alleging age harassment, negligent supervision and retention, tortious interference with his employment relationship with Matt Castrucci's Auto Mall, promissory estoppel, implied contract, fraud and intentional misrepresentation, and wage-and-hour violations of both federal and Ohio law. Sutton filed an answer and a counterclaim alleging tortious interference with employment, negligent supervision or retention, wage-and-hour violations, and fraud and intentional misrepresentation.

{¶ 9} After depositions were taken, Sheaffer and Sutton filed motions for summary judgment on Hidy's complaint and on their counterclaims. Hidy filed motions for summary judgment on all of the counterclaims of Sheaffer and Sutton.

{¶ 10} On March 25, 2008, the trial court granted Hidy's summary-judgment motions in part and denied Sheaffer's and Sutton's motions for summary judgment in their entirety. The trial court granted summary judgment for Hidy on Sheaffer's counterclaims for age discrimination, tortious interference with em-

ployment, negligent supervision or retention, fraud and intentional misrepresentation, and wage-and-hour violations. The court also granted summary judgment for Hidy on Sutton's counterclaims for tortious interference with employment, negligent supervision or retention, wage-and-hour violations, and fraud and intentional misrepresentation. The parties subsequently settled the counterclaims for promissory estoppel and implied contract.

{¶ 11} Sheaffer and Sutton filed a notice of appeal on April 16, 2008. While the appeal was pending, Hidy dismissed its complaint for declaratory judgment.

{¶ 12} Sheaffer and Sutton filed their appellate brief, to which three exhibits were attached. Hidy filed a motion to strike exhibits 2 and 3 because those exhibits are not included in the record of the trial court as certified by the clerk of courts under App.R. 9. We agree and sustain Hidy's motion to strike. Exhibits 2 and 3 attached to Sheaffer and Sutton's appellate brief will not be considered in this appeal.

FIRST ASSIGNMENT OF ERROR

{¶ 13} "The trial court erred by denying Sheaffer's motion for summary judgment and by granting Hidy's motion for summary judgment regarding Sheaffer's age-harassment claim."

{¶ 14} When reviewing a trial court's grant of summary judgment, an appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. "De Novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.* (1997), 122 Ohio App.3d 378, 383, 701 N.E.2d 1023, citing *Dupler v. Mansfield Journal Co.* (1980), 64 Ohio St.2d 116, 119–120, 18 O.O.3d 354, 413 N.E.2d 1187. Therefore, the trial court's decision is not granted any deference by the reviewing appellate court. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

{¶ 15} "The appropriateness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Inc.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46. See also Civ.R. 56(C).

{¶ 16} In Count I of his counterclaim, Sheaffer alleged that "Hidy Honda discriminated against Sheaffer on the basis of his age regarding the terms, conditions, and privileges of employment, including, but not limited to, harassing

him, constructively discharging him, and failing to pay him the sales commissions and bonuses he had earned, in violation of Ohio Revised Code 4112.02(A)."

{¶ 17} R.C. 4112.02(A) provides that it shall be an unlawful discriminatory practice:

{¶ 18} "For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 19} The Ohio Supreme Court generally follows the analytic framework established by federal case law for use under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 et seq., in interpreting and deciding age-discrimination claims brought under R.C. 4112.02. *Bullock v. Totes, Inc.* (Dec. 22, 2000), Hamilton App. No. C–000269, 2000 WL 1867400. The criteria for a prima facie claim of a hostile environment under the ADEA are that (1) the employee is 40 years or older, (2) the employee was subjected to harassment, either through words or actions, based on age, (3) the harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer. *Crawford v. Medina Gen. Hosp.* (C.A.6, 1996), 96 F.3d 830, 834–835.

{¶ 20} The trial court granted Hidy's motion for summary judgment on Sheaffer's R.C. 4112.02 claim on a finding that "[t]he overwhelming hurdle [Sheaffer] cannot overcome is that despite what he alleges as abusive and unprofessional conduct, this Court cannot find any evidence that the employer's action made working conditions intolerable or in any way negatively affected the work opportunity of [Sheaffer] *based* upon age discrimination." (Emphasis sic.)

{¶ 21} In reviewing the trial court's judgment, we must keep in mind that "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Crawford,* 96 F.3d at 835. Further, "[w]hether harassment is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a question of fact.'" Id. at 835–836, quoting *Amirmokri v. Baltimore Gas & Elec. Co.* (C.A.4, 1995), 60 F.3d 1126, 1130–1131.

{¶ 22} A court must consider all of the relevant circumstances in order to determine whether an environment is hostile or abusive. These circumstances

"may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris v. Forklift Sys., Inc.* (1993), 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295.

{¶ 23} In response to Interrogatory No. 18 of Hidy's first set of interrogatories, Sheaffer set forth the following facts to support his age-harassment counterclaim:

{¶ 24} "When [Hidy General Sales Manager Tim] Bell walked behind [Sheaffer], he would repeatedly say, 'come on old man, pick up your feet.'

{¶ 25} "In July or August, 2006 Bell humiliated [Sheaffer] in front of Vivian Bell after [Sheaffer] informed Bell that a couple wanted to go home and think about buying a car. Bell said, 'Come on old man, get your f* * * * * * head out of your f* * * * * * ass and go out there and slam them.'

{¶ 26} "In January or February, 2007, Bell again humiliated [Sheaffer] this time in front of New Car Sales Manager Bob Coyle. After [Sheaffer] reported to Bell that another couple wanted to go home and think about buying a car, Bell told [Sheaffer] to go get Coyle and return to his office. When [Sheaffer] returned with Coyle, Bell told Coyle to go out and help the 'old man' close the deal. Bell told [Sheaffer] to introduce Coyle as his boss. All of the other salespersons referred to Coyle as the new-car sales manager.

{¶ 27} "In February 2007, Bell broke a promise to Mrs. Sparkland, a disabled customer who wanted to pay an additional $400 on a car she had purchased so that [Sheaffer] and another salesperson who had assisted her could each receive a $200 bonus that Bell assured her that he would take care of. After Mrs. Sparkland left the dealership, [Sheaffer] asked Bell when he would receive his bonus. In response, Bell stated that Hidy Honda would keep the extra $400 and that neither defendant nor the other salesperson would receive a bonus. Bell then stated that Mrs. Sparkland 'was crazy as a damn loon' and explained that he told her that he would take off the extra bonuses that she wanted paid 'just to get the deal.' Later that day, [Sheaffer] approached Bell and expressed his opinion that Bell's decision not to pay the bonuses was unfair. In response, Bell got angry and shouted at Defendant: 'old man, I don't give a f* * * what you think. That's the way it is going to be.'

{¶ 28} "In April, 2007, a child spilled some water on the showroom floor. When [Sheaffer] pointed out the spill to Bell, he responded, 'I've heard that's

what happens when you get your age—you can't control yourself.' [Sheaffer] was so humiliated and angry about Bell's comment, he almost hit Bell.

{¶ 29} "Bell did not subject any of the younger salespersons to the harassment he directed towards [Sheaffer]."

{¶ 30} Sheaffer laid out a number of instances in his deposition testimony and his answer to interrogatories in which Bell directed harsh and crude language at Sheaffer, accompanied by a reference to Sheaffer's advanced age. Also, Sheaffer described instances where Bell made comments that could be construed as humiliating, rather than merely offensive. Sheaffer stated that this treatment at work led to a severe loss of sleep over a period of time and affected his work performance. He explained that the comments by Bell angered him and humiliated him.

{¶ 31} We acknowledge that Sheaffer ultimately has an uphill battle to prove that he was constructively discharged as a result of being subjected to a hostile work environment. However, we believe that the testimony of Sheaffer, along with his answers to interrogatories, is sufficient to create a genuine issue of material fact as to whether Hidy, through Bell, harassed and humiliated Sheaffer on account of his age, which created a hostile work environment and caused Sheaffer's constructive discharge from his employment at Hidy.

{¶ 32} The trial court reasoned that "the fact that Hidy chose to rehire [Sheaffer] after he left the first time belies any willful, reckless, or malicious intent on the part of Hidy to discriminate against [Sheaffer] based upon age. Clearly, had age been a problem for Hidy, [Sheaffer] would simply not have been reoffered a job at Hidy."

{¶ 33} We agree that it defies logic that employers would hire or rehire an employee with the intent to later harass him. However, we do not agree that Hidy's decision to rehire Sheaffer necessarily precludes a finding that Sheaffer was thereafter subjected to age harassment. Age harassment is typically evidenced by a course of conduct that is illogical. Ultimately, the decision to hire or rehire an employee in no way guarantees that the employer will never engage in harassing behavior toward the employee.

{¶ 34} Finally, the trial court stated that "the evidence indicates that [Sheaffer] was not the only person subject to abusive and unprofessional language inasmuch as other salespeople at Hidy were treated in the same manner generally from time to time." Though other employees of Hidy were subjected to crude language, we do not believe that that evidence necessarily precludes Sheaffer's age-harassment claim. Rather, Sheaffer identified a number of instances where offensive or crude language that was directed to him was accompanied by a reference to his advanced age. And unlike in *Crawford v. Medina Gen.*

*Hosp.*, 96 F.3d 830, those were not comments of other employees but were comments of a supervisor that were expressly work-related. Therefore, at the summary-judgment stage, we do not believe that Bell's conduct can be explained away simply as age-neutral motivational tactics.

{¶ 35} Because genuine issues of material fact exist, the trial court erred in granting summary judgment to Hidy on Sheaffer's age-harassment counterclaim but properly denied Sheaffer's motion for summary judgment on this counter-claim.

{¶ 36} The first assignment of error is sustained in part and overruled in part.

SECOND ASSIGNMENT OF ERROR

{¶ 37} "The trial court erred by denying Sheaffer's motion for summary judgment and by granting Hidy's motion for summary judgment regarding Sheaffer's negligent supervision and retention claims."

{¶ 38} The elements of a claim for relief for negligent hiring or retention are (1) the existence of an employment relationship, (2) the employee's incompetence, (3) the employer's actual or constructive knowledge of the incompetence, (4) the employee's act or omission causing the plaintiff's injuries, and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. *Harmon v. GZK, Inc.* (Feb. 8, 2002), Montgomery App. No. 18672, 2002 WL 191598, citing *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 729, 729 N.E.2d 813.

{¶ 39} The trial court granted Hidy's motion for summary judgment on Sheaffer's claim for negligent supervision and retention because Bell's behavior did not constitute incompetence. But harassing behavior is per se incompetent behavior. *Harmon*, 2002 WL 191598, at *16, citing *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 575 N.E.2d 428, and *Myers v. Goodwill Industries of Akron, Inc.* (1998), 130 Ohio App.3d 722, 721 N.E.2d 130. Because there remains a genuine issue of material fact regarding whether Bell's behavior constituted age harassment, there remains a genuine issue of material fact whether Bell was incompetent for purposes of Sheaffer's claim for negligent supervision and retention. *Harmon.*

{¶ 40} The trial court erred in granting Hidy's motion for summary judgment on Sheaffer's counterclaim for negligent supervision and retention, but properly denied Sheaffer's motion for summary judgment on this counterclaim. There-fore, the second assignment of error is sustained in part and overruled in part.

THIRD ASSIGNMENT OF ERROR

{¶ 41} "The trial court erred by denying Sheaffer and Sutton's motions for summary judgment regarding Hidy's declaratory judgment action."

{¶ 42} The basis for Sheaffer's motion for summary judgment was that the noncompetition agreement he signed during his initial period of employment with Hidy did not apply to his second period of employment with Hidy. As explained below in our resolution of the fourth assignment of error, we reject this argument with respect to Sheaffer's claim.

{¶ 43} Sutton's motion for summary judgment on Hidy's complaint argued that the noncompetition agreement was not enforceable based on the factors set forth in *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544. As explained below, the trial court erred in failing to address whether the covenant not to compete, as written, was enforceable. On this record, therefore, a genuine issue of material fact remains for determination regarding whether the noncompetition agreements were legally enforceable.

{¶ 44} The trial court did not err in denying Sheaffer and Sutton's motions for summary judgment on Hidy's complaint. The third assignment of error is overruled.

FOURTH ASSIGNMENT OF ERROR

{¶ 45} "The trial court erred by denying Sheaffer and Sutton's motions for summary judgment and by granting Hidy's motion for summary judgment regarding Sheaffer and Sutton's tortious interference claims."

{¶ 46} At oral argument, counsel for Sutton withdrew Sutton's assignment of error regarding the trial court's decision to grant summary judgment for Hidy on Sutton's tortious-interference claim. Therefore, this assignment of error is overruled with regard to Sutton.

{¶ 47} Sheaffer alleged that Hidy tortiously interfered with his contract of employment with Matt Castrucci when Joe Hidy complained to Matt Castrucci that Sheaffer was in violation of his noncompetition agreement with Hidy, which caused Castrucci to fire Sheaffer.

{¶ 48} The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 172, 707 N.E.2d 853, at paragraph one of the syllabus.

{¶ 49} Sheaffer signed a noncompetition agreement on November 7, 2005. The agreement, entitled "Hidy Honda Employee Non–Compete And Confidentiality Agreement," signed by Sheaffer, provided:

{¶ 50} "[T]he undersigned hereby agrees not to directly or indirectly compete with the business of Hidy Honda during the period of two (2) years following

termination of employment and regardless of the cause or reason for termination, if any.

{¶ 51} "The scope of the agreement not to compete shall mean that the Employee shall not own, manage, operate, consult or be an employee in any business substantially similar to or competitive with the present business of Hidy Honda or such other business activity in which Hidy Honda may substantially engage during the time of employment, unless the dealer principal of Hidy Honda shall agree to same in writing.

{¶ 52} "Such businesses shall include all automobile dealerships, automobile repair shops, and automobile leasing companies located within three (3) miles of Hidy Honda.

{¶ 53} "Such businesses shall also include any business operating as part of or in connection with Matt Castrucci's Auto Mall and its successors or assigns * * *."

{¶ 54} The trial court granted summary judgment for Hidy on Sheaffer's counterclaim for tortious interference with a contract because "Hidy had in his possession a signed non-compete agreement which on its face was valid and he was therefore privileged to protect his legitimate business interest in contacting Matt Castrucci of the existence of this non-compete agreement."

{¶ 55} Sheaffer argues that Hidy was not privileged to act as it did because Sheaffer had not signed a noncompetition agreement when he was rehired by Hidy on May 5, 2006, commencing his second period of employment by Hidy that ended on April 30, 2007, when Sheaffer quit to go to work for Matt Castrucci. That misses the point. Sheaffer signed the written noncompetition agreement when he was first hired by Hidy in November 2005. The agreement applies by its terms to any employment Sheaffer might have during a two-year period following Sheaffer's first resignation on March 15, 2006. Therefore, by its terms, the written agreement applied to Sheaffer's employment by Castrucci that commenced on May 1, 2007, from which Sheaffer was fired following Joe Hidy's telephone call. There is no claim that the call was made after the two-year period beginning on March 15, 2006, had expired.

{¶ 56} Although the telephone call was made within the two-year period provided for in the noncompetition agreement, our inquiry does not end there. For a covenant not to compete to be enforceable, its restrictions must be no greater than that which is required to protect the employer, it must not impose an undue hardship on the employee, and it cannot be injurious to the public. *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 25–26, 71 O.O.2d 12, 325 N.E.2d 544. "Covenants not to compete are valid only when the competition they restrict is somehow unfair, not because it is unfair that the promisor fails to

perform on the promise he made." *Busch v. Premier Integrated Med. Assocs., Ltd.*, Montgomery App. No. 19364, 2003-Ohio-4709, 2003 WL 22060392, at ¶ 17.

{¶ 57} "We have held that factors to be considered in determining reasonableness of the restrictions a covenant imposes include '(1) the existence of time and geographic limitations; (2) whether the employee represents the sole contact with the customer; (3) whether the employee possesses confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to restrict was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment.'" Id. at ¶ 16, quoting *Pratt v. Grunenwald* (June 29, 1994), Montgomery App. No. 14160, 1994 WL 313050.

{¶ 58} If a court finds that a covenant not to compete imposes unreasonable restrictions upon an employee, then the court is empowered to modify or amend the employment agreement. *Raimonde*, 42 Ohio St.2d at 26, 71 O.O.2d 12, 325 N.E.2d 544. A number of two-year covenants not to compete have been either reduced by courts to a one-year time limitation or declared unenforceable as a matter of law. *Facility Servs. & Sys., Inc. v. Vaiden*, Cuyahoga App. No. 86904, 2006-Ohio-2895, 2006 WL 1572236, at ¶ 41, 53–56.

{¶ 59} The trial court did not address whether the covenant not to compete, as written, was enforceable. Therefore, the trial court erred in assuming that the covenant not to compete could be relied on as the basis for Hidy's privilege defense to Sheaffer's tortious-interference claim.

{¶ 60} Hidy argues that summary judgment was correct, nevertheless, because there was no evidence that Hidy acted maliciously when Joe Hidy called Matt Castrucci to complain about the noncompetition agreement. "Actual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship." *Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.* (1997), 125 Ohio App.3d 572, 583, 709 N.E.2d 190. Whether that standard is satisfied depends on whether the two-year agreement was enforceable when Joe Hidy's call was made, an issue that the trial court must determine on remand.

{¶ 61} The trial court erred in granting summary judgment to Hidy on Sheaffer's tortious-interference counterclaim, for the reason it did, absent a prior finding that the 2005 noncompetition agreement was enforceable at the time Joe

Hidy made his telephone call to Matt Castrucci. The trial court properly denied Sheaffer's motion for summary judgment on the counterclaim. Therefore, the fourth assignment of error is sustained in part and overruled in part with regard to Sheaffer and is overruled with regard to Sutton.

FIFTH ASSIGNMENT OF ERROR

{¶ 62} "The trial court erred by denying Sheaffer's motion for summary judgment and by granting Hidy's motion for summary judgment regarding Sheaffer's fraud or intentional misrepresentation claim."

{¶ 63} In paragraph 13 of his counterclaim, Sheaffer explained the basis for his fraud or intentional-misrepresentation claim:

{¶ 64} "Bell also broke a promise to Mrs. Sparkland, a disabled customer who wanted to pay an additional $400 on a car that she had just purchased so that Sheaffer and another salesman who had assisted her could each receive a $200 bonus. After Mrs. Sparkland left the dealership, Sheaffer asked Bell when he would receive his bonus. In response, Bell stated that Hidy Honda would keep the extra $400 and that neither Sheaffer or the other salesman would receive a bonus. Bell stated that Mrs. Sparkland 'was crazy as a damn loon' and that he told her that he would take care of the bonuses that she wanted paid 'just to get the deal.' "

{¶ 65} "A claim of common-law fraud requires proof of the following elements: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Russ v. TRW, Inc.* (1991), 59 Ohio St.3d 42, 49, 570 N.E.2d 1076.

{¶ 66} We agree that Sheaffer's fraud or intentional-misrepresentation claim against Hidy cannot succeed. On this record, Sheaffer was injured when Bell refused to pay him the $400 that Bell had falsely promised Sparkland he would pass on to Sheaffer. However, the alleged representation was made to Sparkland, not to Sheaffer, and the detrimental reliance on the misrepresentation alleged was on the part of Sparkland, not Sheaffer. Therefore, Sheaffer cannot show that he was injured as a proximate result of the misrepresentation alleged. Rather, Sheaffer's alleged injury proximately resulted from Bell's refusal to pay Sheaffer.

{¶ 67} The fifth assignment of error is overruled. The judgment of the trial court is reversed in part and affirmed in part. The cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN and WOLFF, JJ., concur.

WILLIAM H. WOLFF JR., retired, of the Second Appellate District, sitting by assignment.