2016 IL App (1st) 150718

Sixth Division
Opinion filed: May 20, 2016

No. 1-15-0718

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE COOK COUNTY SHERIFF'S OFFICE, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 13 CH 17663 |
| | ) | |
| THE COOK COUNTY COMMISSION ON | ) | |
| HUMAN RIGHTS and CYNTHIA WALKER, | ) | Honorable |
| | ) | Rodolfo Garcia, |
| Respondents-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion
Presiding Justice Rochford and Justice Delort concurred in the judgment and opinion.

**OPINION**

¶ 1     The petitioner, Cynthia Walker, filed a claim with the Cook County Commission on Human Rights (Commission), alleging that she was subjected to ongoing sexual and age discrimination and harassment in violation of section 42-35 of the Cook County Human Rights Ordinance (Ordinance) (Cook County Code of Ordinances §§ 42-35(b)(1), (e) (amended Nov. 19, 2002), while at her job at the Department of Corrections (DOC).  The Commission found in favor of the petitioner, and the circuit court confirmed the Commission's decision on review

pursuant to a writ of *certiorari*. The Cook County Sheriff's Office (Sheriff's Office) now appeals, raising as issues whether: (1) the Commission's determination that the petitioner was subjected to sexual harassment was against the manifest weight of the evidence; (2) the Commission erred in expanding the definition of age discrimination under the Ordinance to include harassment based upon age, or, alternatively (3) its finding of age-related harassment was against the manifest weight of the evidence; and (4) the Commission exceeded its authority under the Ordinance in issuing certain injunctive relief, or (5) the injunctive relief as ordered was clearly erroneous.   For the reasons that follow, we affirm.

¶ 2     The petitioner filed a complaint with the Commission on March 20, 2008, alleging that, beginning in April 2004 and continuing through late 2008, her coworker and eventual supervisor, Antonio Belk, subjected her to ongoing sexual discrimination by engaging in unwanted physical contact with her and making sexual remarks.   The petitioner also alleged that, on numerous occasions beginning in September 2007 and continuing through 2008, Belk made age-related jokes and derogatory comments towards her, in many instances in front of colleagues.   Belk's alleged sexual and age-related harassment of the petitioner continued unabated despite her complaints to the director of her department, Andrew Krok.

¶ 3     Beginning on December 10, 2010, the matter proceeded to a hearing involving the testimony of numerous witnesses, including the petitioner and Belk.   The petitioner testified that she was 54 years of age and had been married for 35 years.   In April 2004, she began working at the DOC in the department of Management Information Systems (MIS).   The petitioner stated that she was hired as a computer operator, but that she was subsequently recruited to design multiple databases for MIS.

¶ 4    Shortly after the petitioner began working at MIS, Belk, a jail supervisor, approached her and requested her help in designing a program services database. Belk worked in a different office than the petitioner at that time; however, the database project caused the two to come into fairly regular contact. The testimony of Krok and Belk established that, although Belk had used computers for work, he had extremely limited knowledge about programming and could not effectively supervise employees with greater expertise on programming projects.

¶ 5    The petitioner testified that, on several occasions in 2004 and early 2005, while she was involved with Belk's database project, he engaged in acts that made her feel very uncomfortable, including massaging her shoulders, trying to kiss her, touching her face and hair, and hugging her. She described an incident in May 2004 when Belk was at her desk discussing the database project, and then walked behind her and began massaging her shoulders and invited her to dinner twice. The petitioner asked Belk to stop touching her, stating that she was happily married and was not interested. She also advised Belk that the work he was giving her was causing her to fall behind in her own job and that he should obtain approval from the MIS supervisor before giving her additional work.

¶ 6    During her testimony, the petitioner frequently refreshed her recollection regarding dates and other details by referring to her personal journal (journal), which she had kept since she began employment with the DOC. The journal was admitted into evidence by stipulation of the parties. According to the petitioner, she tried to consistently record events at work that were upsetting to her. However, although the journal included a description of the incident in May of 2004, it made little or no mention of any other alleged physical advances during the time between April 2004 and mid-2005. The petitioner testified that, at first, she did not consider

Belk's contact to be sexual "harassment" because he occasionally hugged other employees in the department. However, he soon began treating her differently from everyone else in the office.

¶ 7    The petitioner testified that, on more than one occasion, she informed the current MIS director, Lisa Dowdell, about Belk's behavior and stated that she believed it would continue unless Dowdell did something about it. The petitioner then spoke to the subsequent MIS director, Dwayne Peterson, who told her to let him know if Belk approached her again. After the petitioner finished the database project in August 2005, she had little contact with Belk for over one year.

¶ 8    In August 2006, Krok became the director of MIS. Krok testified that, shortly thereafter, Belk was transferred from the jail into MIS and became his second-in-command, making Belk the petitioner's direct supervisor. The petitioner testified that she had a meeting with Krok at the time of Belk's transfer and informed him about her prior issues with Belk, stating that she did not want to be assigned to work under him. According to the petitioner, Krok assured her that he would intervene if necessary, and she promised to report to him if the situation with Belk "got out of hand." Belk formally became the petitioner's supervisor in September or October of 2006.

¶ 9    The petitioner testified that, almost immediately after Belk's appointment as her supervisor, Belk's unwanted physical advances and sexual remarks resumed, and continued through 2007. The petitioner stated that Belk repeatedly tried to hug and kiss her, but she pushed him away and told him to stop. Belk would massage her shoulders while she was in her chair, run his hands through her hair, hug her and try to touch her face, despite her ongoing protests. The petitioner stated that Belk began using profane language during these episodes, and occasionally made reference to her husband. At one point in December 2006, she knocked

Belk's hand away and told him to keep his hands off of her. Later in the day, Belk told the petitioner to "shut up" and sit her "old ass down."

¶ 10 The petitioner also testified that, from late 2006 through 2007, Belk regularly and persistently made negative comments about her age in front of other MIS employees. Although the petitioner viewed the comments as childish banter in the beginning and made efforts at joking responses, she testified that Belk soon got "out of hand." His comments included referring to the petitioner as the "old dude," and stating that the petitioner was the "oldest ass" walking around there; she was older than God; older than "motherf*** shit" or older than dirt; and that she wore "old ass" clothes. The petitioner also stated that, beginning in September of 2007, Belk regularly began the workday by singing "Old Fogey from Musgokee" to her in front of her coworkers.

¶ 11 In addition, according to the petitioner, Belk frequently gave her programming duties without following MIS protocol, which required that all work orders go through Krok. The petitioner described these projects as above and beyond those she was expected to do as part of her job. One such project was for the petitioner to do Belk's homework for a computer class that he was taking on his own time. The petitioner testified that she completed homework assignments for Belk for nearly one year. She complained to Krok about the extraneous projects, and Belk later confronted her, warning her to watch what she said to Krok about him and that his "ass was covered."

¶ 12 The petitioner described an incident in January of 2007, during which Belk attempted to place her into a headlock as she walked down the hallway. The petitioner testified that she felt like she was being attacked and was initially unable to break free from Belk's grip. When she did break free, her hair was "all over [her] head." The incident occurred in the presence of other

coworkers, including LaJuana McRoy. The petitioner reported the occurrence to Dowdell and Gwen Davis, the supervisor in the employee discipline department, but no action was taken. She testified that she also attempted to report the matter to Krok, but he dismissed her because he was too busy.

¶ 13   According to the petitioner, in April or May of 2007, Belk represented to her that they were going to another area to work on the databases, but instead drove her to a restaurant for lunch, ignoring her protests and requests to return to work. The petitioner also testified that, as they were preparing to leave the restaurant, Belk placed his hand on her lower back and stated that they "should do this more often."

¶ 14   The petitioner's account of her encounters with Belk was corroborated by other witnesses, including McRoy, who testified that she saw Belk putting the petitioner into a headlock and also hugging her on several occasions. According to McRoy, she was shocked when Belk placed the petitioner in a headlock, and the petitioner also appeared shocked. McRoy stated that, as far back as 2004, the petitioner made it very clear to everyone in the office that she was uncomfortable with being touched by Belk. McRoy also stated that Belk made remarks mocking the petitioner's age on a nearly daily basis in the presence of coworkers. McRoy never heard Belk make reference to anyone's age aside from the petitioner, and did not consider his comments to the petitioner to be a joke. McRoy believed that Belk created a hostile work environment for the petitioner.

¶ 15   Belk denied making any of the physical advances claimed by the petitioner, including allegedly placing her in a headlock. Belk also denied making any comments to the petitioner about her age other than referring to her as an old fogey or old timer on a few occasions.

According to Belk, he refrained from making age-related remarks when the petitioner requested that he stop.

¶ 16    The petitioner testified that, in 2007, she met with Krok on at least two occasions to complain about Belk's conduct.  She told Krok that Belk was getting out of hand, and asked him to intervene.  She explained in detail about Belk's unwanted physical contact and his near-daily derogatory commentary about her age.   According to the petitioner, Krok acted as if he didn't believe her, laughed at one point, and did nothing.

¶ 17    The petitioner stated that, when Belk learned about her meetings with Krok, he confronted her on numerous occasions and warned her about his power within the DOC.  On one occasion, Belk threw a punch near her face and threatened to knock her teeth out.   On another occasion, Belk approached her and said that whatever she said to Krok about him would get back to him and that he "owned this *** jail."   Belk also told the petitioner to "watch what the f***" she said and that he was going to "f*** [her] up."   The petitioner testified that Belk yelled so loudly at one point that it drew coworkers to her aid, at which time Belk began hugging her.

¶ 18    Davis testified that she also spoke with the petitioner on numerous occasions regarding her encounters with Belk.  She described the petitioner as becoming increasingly emotional throughout 2007 and eventually reaching a "panic state."   Davis stated that she initially recommended that the petitioner discuss the situation with her supervisor, but later referred her to the Employee Assistance Program.  According to Davis, the petitioner was naïve with regard to certain life experiences, and Belk used this to get what he wanted.  She acknowledged giving a prior statement that, based upon her conversations with the petitioner, she believed Belk "came at [the petitioner] sexually to get her to continue doing work for him so he could make himself

look good." Davis also confirmed her prior statement that she believed Belk had subjected the petitioner to a hostile work environment as a result of his conduct.

¶ 19    Near the end of 2007, the petitioner met with a representative from the Employee Assistance Program who advised her to speak with her supervisor, seek counseling, and report the situation to the DOC's Office of Professional Review. In January 2008, the petitioner missed several days of work, and then commenced psychological counseling services provided by the Employee Assistance Program.

¶ 20    The petitioner testified that, after having cancelled prior meetings, Krok finally met with her on January 4 and 8, 2008. She told Krok that she feared that Belk would retaliate against her if her complaints about him became public, and Krok assured her Belk would not find out. Following the January meetings, Belk was removed as the petitioner's supervisor, although he continued working in MIS. He was not transferred out of MIS until nearly one month later, after the petitioner notified Krok about another encounter in which Belk inappropriately gestured to her and intentionally bumped into her.

¶ 21    In his testimony, Krok admitted that the petitioner told him in October 2006 that she "had a problem with" Belk. He also testified that he learned in mid-2007 that Belk was giving the petitioner assignments outside of the normal chain of command in MIS, and that he knew at that point that there was "more than a mere personality conflict" between them. Nonetheless, Krok admittedly undertook no further investigation into the petitioner's claims. Krok stated that the January 2008 meeting was the first time he gave the petitioner a copy of the DOC's sexual harassment policy. This was also the first time that he informed DOC's first assistant executive director, Scott Kurtovich, about the matter, describing the petitioner's complaint in a memorandum to both him and Tom Kinsella in the Office of Professional Review.

¶ 22    Kurtovich testified that he "assumed" that, after Krok informed him regarding the petitioner's allegations of sexual and age harassment, he had instructed Krok to follow the "harassment policy" and report the matter to the Office of Professional Review for an investigation.    However, Kurtovich stated he was not aware Belk and the petitioner had continued to work together in the same office for one month after the January 8, 2008, meeting.

¶ 23    On January 22, 2008, the petitioner filed a formal complaint with the Office of Professional Responsibility detailing her allegations of Belk's discriminatory acts and threats against her.  The assigned investigator, Carl Singletary, interviewed several witnesses, including Belk, and determined that the petitioner's allegations of sexual and age discrimination were not sustained.  However, Singletary acknowledged having found evidence that Belk placed the petitioner in a head lock and put his hands through her hair.  He also admitted obtaining a copy of the petitioner's journal containing daily notations of Belk's ongoing physical advances and improper remarks. Singletary believed that, based upon the harassment policy of the Sheriff's Office, a claim of sexual or age discrimination would require corroboration of the petitioner's claims.

¶ 24    Dr. Mary Lee, the petitioner's psychologist when she commenced treatment with the Employee Assistance Program, testified that the petitioner's ongoing experiences with Belk caused her to suffer acute anxiety, post-traumatic stress disorder and panic attacks.  As part of her treatment, the petitioner was taking multiple anti-anxiety, anti-depression, and sleep medications.  Dr. Lee testified that the petitioner continued to suffer from post-traumatic stress disorder, which included experiencing flashbacks, nightmares and panic attacks, as a result of passing encounters with Belk after he was transferred out of MIS.  The petitioner remained under Dr. Lee's care through the time of the hearing.

¶ 25    On December 30, 2011, the hearing officer issued his recommended decision and order which was adopted in its entirety by the Commission. The Commission determined that the petitioner sufficiently proved Belk had subjected her to sexual and age-related harassment beginning from the time he was appointed as her supervisor in September 2006.  However, the Commission declined to find that Belk's conduct rose to the level of sexual harassment during the period from April 2004 through March 2005.   Although the Commission found the petitioner's overall testimony to be credible, it noted that her account of Belk's physical advances during the period of 2004-05 seemed a bit "overstated," as evidenced by a lack of corresponding entries in her journal.  The Commission further noted that, although Krok had been aware of the petitioner's issues with Belk since prior to Belk's appointment as the petitioner's supervisor, he ignored the petitioner's ongoing complaints until January of 2008 when she was "close to an emotional breakdown" and had been referred to the Employee Assistance Program. Accordingly, the Commission awarded the petitioner $75,000 in damages for emotional distress and also imposed extensive injunctive relief under section 42-34(c) of the Ordinance.   In ordering the injunctive relief, the Commission noted that such relief was essential because "the evidence in this case reveals that any enforcement mechanism" that the DOC allegedly had in place to protect employees from sexual or age-related harassment "is broken and needs to be repaired."

¶ 26    The circuit court confirmed the decision of the Commission, and the instant appeal followed.

¶ 27    The authority of the Commission is derived from the Illinois Human Rights Act (Act) (775 5/1-101 *et seq.* (West 2012)).  As the Act has not expressly adopted the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)), or provided for other forms of review, the

review of the Commission's decision in this case was by way of the common law writ of *certiorari*. *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 333 (2009). The standards of review applicable upon a writ of *certiorari* are the same as those applied to review under the Administrative Review Law. *Landers v. Chicago Housing Authority*, 404 Ill. App. 3d 568, 571 (2010). On appeal from a circuit court's decision, we review the determination of the administrative agency, not that of the circuit court. *Id*.

¶ 28    In an appeal from an administrative decision, "[t]he applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." (Internal quotation marks omitted.) *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). On questions of fact, the Board's findings are deemed *prima facie* true and correct and will not be reversed unless they are against the manifest weight of the evidence. *Id*. In making this determination, this court will not weigh the evidence or substitute its judgment for that of the agency. *Id.* An administrative agency's factual determinations are against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* In contrast, an agency's decision on a purely legal issue is entitled to no deference by this court and is reviewed under the *de novo* standard. *Id.* Finally, where there is a mixed question of law and fact, we review the agency's determination under the clearly erroneous standard. Mixed questions are those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." (Internal quotation marks omitted.) *Id*. at 211. Under the clearly erroneous standard, we reverse only where we are left with the "definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id*.

¶ 29    The language and purpose of the Ordinance essentially parallels that of the Act with regard to the prohibition against employment discrimination and sexual harassment.   See 775 ILCS 5/2-102(A), 1-103 (West 2012).   In reviewing sexual harassment cases under the Ordinance, we are guided by analogous decisions arising under the Act, and may also consider cases determined under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000a *et seq.* (2012)).   See *Zaderaka v. Illinois Human Rights Comm'n¸* 131 Ill. 2d 172, 178 (1989); *Powell v. City of Chicago Human Rights Comm'n*, 389 Ill. App. 3d 45, 52 (2009).

¶ 30    As its initial assignment of error, the Sheriff's Office makes several arguments which it claims demonstrate that the Commission's determination that the petitioner suffered sexual harassment at the hands of Belk in the period after September 2006 was against the manifest weight of the evidence.   We address each in turn.

¶ 31    Under the Ordinance, it is unlawful for employers to engage in discriminatory conduct "against any individual in hiring \*\*\* or other term, privilege, or condition of employment on the basis of unlawful discrimination." Cook County Code of Ordinances § 42-35(b)(1) (amended Nov. 19, 2002). "Unlawful discrimination" is defined under section 42-31 as any discrimination based upon, *inter alia*, an individual's race, sex, or age.   In addition, section 42-35(e) of the Ordinance prohibits employers or their agents or employees from engaging in "sexual harassment" in the workplace.   Sexual harassment is defined as "any unwelcome sexual advance, request for sexual favors, or any conduct of a sexual nature" that, in relevant part, "has the purpose or effect of substantially interfering with an individual's work performance or creating an *intimidating, hostile, or offensive working environment*." (Emphasis added.)   Cook County Code of Ordinances § 42-35(e) (amended Nov. 19, 2002)  An employer is liable for the acts of its supervisory personnel which constitute sexual harassment, regardless of whether the acts were

forbidden by the employer or even whether the employer knew or should have known of their occurrence. *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 141 (2009).

¶ 32    In determining what sexual conduct creates a "hostile work environment" sufficient to sustain a finding of sexual harassment, our courts have adopted the two-part test established in the Title VII case of *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993); see *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 517 (1994).  In particular, the aggrieved employee must present evidence that the respondent engaged in behavior (1) that was severe or pervasive enough to create a work environment that a reasonable person would find to be "hostile or abusive"; and (2) that the employee herself subjectively perceived to be hostile or abusive. *Harris*, 510 U.S. at 21-22.  In determining whether both of these elements have been met, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 22-23; *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 55.  Although the employee need not prove that she suffered tangible psychological injury or a "nervous breakdown," the "mere utterance of an … epithet which engenders offensive feelings" is insufficient to constitute harassment. (Internal quotation marks omitted.)  *Harris*, 510 U.S. at 21-22.

¶ 33    The Sheriff's Office first contends that the petitioner failed to demonstrate that she "subjectively" perceived her work environment to be hostile or abusive as a result of Belk's conduct.  It points to the Commission's finding that Belk's conduct did not rise to the level of sexual harassment during the period of April 2004 through March 2005, and asserts that there was no significant difference between Belk's "sexual touchings" of the petitioner in that period

as compared to the period after he became her supervisor in September 2006. Therefore, according to the Sheriff's Office, the Commission's finding of sexual harassment for the period after September 2006 cannot be reconciled with its finding of no harassment during the 2004-05 time period, and is, accordingly, against the manifest weight of the evidence.

¶ 34    We find the analysis offered by the Sheriff's Office to be misplaced. Indeed, the petitioner testified that, while she found Belk's acts of hugging her and massaging her shoulders in 2004 to be unwelcome, she did not initially consider them to be sexual harassment. However, it was not the nature of these acts *per se*, but rather, their pervasiveness and severity that formed the basis for the Commission's determination. It was clear from both the petitioner's testimony and her journal entries that, once Belk was transferred into her department and became her direct supervisor, his physical advances and comments escalated in frequency and intensity and, importantly, began to significantly impair her ability to perform her job. The petitioner's ongoing efforts to stop Belk's sexual advances were often met with profanity and physically threatening behavior on his part, including his act of pushing her on at least one occasion. Her mental state eventually declined to the point that Davis felt it necessary to refer her to the DOC's Employee Assistance Program. The petitioner commenced treatment with a psychologist and was diagnosed with post-traumatic stress disorder, among other issues, all the undisputed result of Belk's conduct. In light of these circumstances, we are unable to conclude that the Commission's finding that the petitioner subjectively experienced a hostile work environment as a result of Belk's sexual advances was against the manifest weight of the evidence.

¶ 35    The Sheriff's Office also argues that the evidence does not support a finding of sexual harassment under the objective test in *Harris*. As an apparent alternative argument to that raised above, it maintains that Belk's physical advances were not sufficiently sexual in nature, and that

conduct such as placing the petitioner in a headlock was, "at worst[,] unprofessional, disrespectful and sometimes threatening." We disagree.

¶ 36    Alleged discriminatory conduct is often comprised of a series of incidents and cannot be considered in a vacuum. *Sangamon County*, 233 Ill. 2d at 141-42; *Jenkins v. Lustig*, 354 Ill. App. 3d 193, 196 (2004). It must be evaluated from the perspective of a reasonable person in the plaintiff's position in the context of the situation in which the conduct arose. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998). Further, as observed by the Commission, sexual discrimination or harassment "is often motivated by issues of power and control" (*Tanner v. Prima Donna Resorts, Inc.*, 919 F. Supp. 351, 355 (D. Nev. 1996)), and, for this reason, need not necessarily be found to have been motivated by sexual desire. *Oncale*, 523 U.S. at 80.

¶ 37    While it is true that Belk subjected the petitioner to a range of demeaning and coercive acts, he also engaged in acts that were undeniably sexual in nature, including attempting to kiss her, massaging her shoulders, running his hands through her hair and touching her face, and pressuring her for dates. Such contact was exacerbated by the fact that it was often combined with profane language and physical threats. In addition, for over one year, Belk persisted in these sexual advances notwithstanding the petitioner's obvious discomfort and demands that he stop, and her efforts to report him to supervisors. We find that these circumstances sufficiently constituted sexual misconduct giving rise to a work environment that a reasonable person would consider hostile and abusive, as contemplated under the second prong of the test in *Harris*, 510 U.S. at 22-23.

¶ 38    The Sheriff's Office next argues that the petitioner's account of events was not credible, because she relied too much upon her journal throughout her testimony rather than testifying

from her own memory. It further asserts that the Commission placed too much emphasis on the evidence in the petitioner's journal and suggests that the journal's contents were not accurate or reliable. We reject both contentions.

¶ 39    The question of whether the petitioner excessively relied upon her journal goes merely to the weight to be afforded her testimony, rather than its admissibility. See *Corrales v. American Cab Co.*, 170 Ill. App. 3d 907, 911 (1988). Determinations as to the credibility of witnesses and the weight to be given their testimony are reserved for the Commission; it is not this court's function to substitute its judgment on those issues. *Christ Hospital & Medical Center v. Human Rights Comm'n*, 293 Ill. App. 3d 105, 109-10 (1997). Although the petitioner frequently looked to her journal to refresh her recollection as to particular dates or specific details of conversations, we see no basis to discount her testimony. The Commission found the petitioner to be credible, and we are unable to conclude that this finding was against the manifest weight of the evidence.

¶ 40    To the extent that the Sheriff's Office seeks to challenge the competency of the evidence contained in the journal, its argument comes too late. Evidentiary rulings may not be challenged on appeal if they have not been properly preserved. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 13 (citing *Thornton v. Garcini*, 237 Ill. 2d 100, 106 (2009)). Here, not only did the Sheriff's Office fail to raise any objection to the admission of the journal before the Commission, it acquiesced in its admission by its joint stipulation. It cannot now be heard to contest the competency of the journal. Based upon the foregoing analysis, we conclude that the evidence sufficiently demonstrated that Belk's conduct created an "intimidating, hostile or offensive work environment" so as to constitute sexual harassment under section 42-35(e) of the Ordinance.

¶ 41    Next, the Sheriff's Office argues that the Commission erred in granting the petitioner relief based upon alleged age-related harassment because the Ordinance does not specifically

include such a prohibition within its provisions. As this issue involves a matter of statutory construction, we review it under the *de novo* standard. *Crittenden v. Cook County Comm'n of Human Rights*, 2013 IL 114876, ¶ 46.

¶ 42 The Ordinance, similar to the Act, bars employers from discriminating against individuals with regard to discipline, terms, privileges, or conditions of employment on the basis of "unlawful discrimination," which includes discrimination based upon an individual's age, if over 40 years. Cook County Code of Ordinances §§ 42-35(b)(1), 42-31 (amended Nov. 19, 2002). Although it allows for claims based upon sexual harassment, there is no specific provision for harassment based upon age or any of the other protected classes.

¶ 43 Our research has failed to uncover any case law directly addressing the question of whether the Ordinance's prohibition against age-related discrimination also encompasses age-related harassment. However, this court has recognized a claim for harassment under the Act in cases involving other protected classes. See, *e.g.*, *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339, 350 (1989) (racial harassment actionable under the Act). Further, it is well-established that, under Title VII,[1] freedom from workplace "discrimination" also encompasses the protection against a hostile work environment or workplace harassment. *Crawford v. Medina General Hospital*, 96 F.3d 830 (6th Cir. 1996). The rationale underlying this principle was stated in *Harris*, wherein the Court observed that Title VII's phrase barring employers from discriminating regarding the "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of

---

[1] Title VII precludes employers from discriminating against any individual with respect to the "terms, conditions, or privileges of employment" based upon race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1) (Supp. I 2012). It does not expressly bar discrimination based upon age. See *Williams v. Department of Veterans Affairs*, No. 12-CV-8400, 2016 WL 946903, at *7 (N.D. Ill. Mar. 14, 2016).

disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." (Internal quotation marks omitted.) *Harris*, 510 U.S. at 21. Title VII is violated whenever the workplace is permeated with discriminatory "intimidation, ridicule, and insult" that is severe or pervasive enough to "alter the conditions of the victim's employment and create an abusive working environment." (Internal quotation marks omitted.) *Id.* at 21 (citing cases).

¶ 44 Like the Ordinance, the Age Discrimination in Employment Act (ADEA) (29 U.S.C. § 623 (2012)) prohibits an employer from discriminating against any individual with respect to his "terms, conditions, or privileges of employment, because of such individual's *** age." It is well-recognized that "the ADEA and Title VII share common substantive features and also a common purpose," which is the "elimination of discrimination" in the workplace. *Crawford*, 96 F.3d at 834 (quoting *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 357 (1995)); see also *Lorillard v. Pons*, 434 U.S. 575, 584 (1978) (noting "the prohibitions of the ADEA were derived *in haec verba* from Title VII"); *c.f. Zaderaka*, 131 Ill. 2d at 178 (adopting the analytical framework utilized by the United States Supreme Court in cases under both Title VII and ADEA). Given these similarities, and the established recognition that proof of a hostile work environment forms a valid basis for relief under Title VII, the court in *Crawford* found it a "relatively uncontroversial proposition" that such a theory would also constitute a viable claim under the ADEA. *Crawford*, 96 F.3d at 834. Nearly all federal courts of appeals, as well as the federal district courts, have also held that hostile work environment claims are viable under the ADEA. *Alexander v. CIT Technology Financing Services*, *Inc.*, No. 01 CV 7217, 2002 WL 69493, at *3 (N.D. Ill. Jan.18, 2002); see also *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir. 1991).

¶ 45    We find the rationale advanced in *Crawford* to be applicable to age-discrimination claims under the Ordinance.  It is readily apparent that, where an employer subjects an employee to a work environment sufficiently hostile or abusive, it is "acting with respect to" the "terms, privileges, or conditions" of that individual's employment under § 42-35(b)(1).   Where an employee can prove that her age was used as a basis to create such a hostile work environment, she proves unlawful discrimination under the Ordinance.  Therefore, we conclude that a showing of a hostile work environment based upon age-related harassment constitutes discrimination within the meaning of the Ordinance.

¶ 46    In the alternative, the Sheriff's Office contends that the Commission's finding that Belk subjected the petitioner to age-related harassment is against the manifest weight of the evidence, because certain entries in her journal suggest that she considered Belk's comments about her age to be merely jokes. In addition, the Sheriff's Office points to the accounts of some witnesses, whom it does not name, who allegedly testified that they considered Belk's comments to be jokes.

¶ 47    The position of the Sheriff's Office on this issue merely reflects its own perception of the evidence.  Not only did the petitioner repeatedly deny that she considered Belk's age-related comments a joke, but McRoy also testified that no one could have considered them as such.  The Commission found this testimony credible, and specifically rejected the testimony of other witnesses, some of whom were impeached, trying to downplay Belk's near-daily comments, insults and profanity with regard to the petitioner's age.  Accordingly, we are unable to conclude that the Commission's finding of age-related harassment was against the manifest weight of the evidence.

¶ 48    Finally, the Sheriff's Office urges that the Commission's award of prospective injunctive relief be vacated because it exceeded the Commission's authority as set forth under section 42-34(c) of the Ordinance. Alternatively, it contends that the injunctive relief was excessive and onerous and that it therefore must be reversed as unreasonable and arbitrary.

¶ 49    In its injunctive order, the Commission required that the DOC: (1) adopt a policy making age harassment as defined under the Ordinance a violation of the DOC's employment policies; (2) arrange a meeting with Belk to inform him that his conduct constituted a violation of the Ordinance and would not be permitted to recur without severe disciplinary consequences; (3) bar Belk from all future contact with the petitioner; (4) adopt procedures making it clear to persons who have been subjected to age or sexual harassment that they should report those claims, and directing all supervisors who have learned of potential claims to report such information to the Office of Professional Services; (5) retain a consultant to extensively train directors, managers and other supervisory personnel regarding the elements of sex and age harassment, and methods to protect against such conduct and properly investigate it if it occurs; (6) distribute a written manual detailing the terms and enforcement of the new policies and procedures that will be adopted to prevent sex or age harassment, and that will preclude retaliatory action against persons making harassment claims; (7) take immediate action to ensure that the petitioner is not subjected to any further sex or age harassment or other negative treatment; and (8) certify its compliance with the injunction to the executive director of the Commission.

¶ 50    The Act sanctions the creation of the Commission and enactment of the Ordinance for the purpose of "secur[ing] for all individuals *** freedom from unlawful discrimination [and] sexual harassment in employment." 775 ILCS 5/7-108(A) (West 2012). To accomplish this end, section 42-34(c) of the Ordinance enumerates 12 forms of remedy which may be imposed by the

Commission upon a finding of unlawful discrimination under the Ordinance. Section 42-34(c) states, in relevant part, as follows:

> "(1) Relief *may include, but is not limited to*, an order to:
>
> a. Cease the illegal conduct complained of and to take steps to alleviate the effect of the illegal conduct complained of;
>
> * * *
>
> h. Take such action as may be necessary to make the complainant whole  ***;
>
> i.  File with the Commission a report as to the manner of compliance;
>
> j. Post in a conspicuous place notices which the Commission may publish or cause to be published setting forth requirements for compliance with this article or other relevant information which the Commission determines necessary to explain this article ***." (Emphasis added.)  Cook County Code of Ordinances § 42-34(c) (amended Nov. 19, 2002).

¶ 51    The Sheriff's Office contends that the injunctive relief ordered by the Commission does not fall within any of the above enumerated categories, and is therefore invalid. We disagree.

¶ 52    The plain and unambiguous language of section 42-34(c) vests the Commission with broad authority to fashion a remedy which "may include" but "is not limited to" 12 categories of relief. When the legislature employs a phrase such as "including but not limited to" preceding a list of things, the phrase is interpreted to mean that the ensuing list is merely illustrative rather than exhaustive. *People v. Perry*, 224 Ill. 2d 312, 330 (2007).  Moreover, the language of some of the above remedies is expansive, authorizing the Commission itself to publish or "cause to be published" notices "setting forth requirements for compliance" with the Ordinance, or to compel wrongdoers to "take steps" necessary "to alleviate the effect of the illegal conduct."  Construed

as a whole, this language reflects an intention that the Commission employ its discretion to devise a plan to effectively address and prevent discriminatory activity based upon the circumstances of each particular case.

¶ 53    The Sheriff's Office argues that it already had an anti-discrimination policy in place and that the one imposed under the injunction is "unreasonable and onerous."  It fails to sufficiently argue, however, how the relief imposed was unduly onerous, and we consider this assertion to be without merit.  As for the existing policy, the Commission noted that there was no such document introduced into evidence and that, in any event, any policy with regard to enforcement of discrimination claims was "broken."  We see no reason to disturb this finding.  It was undisputed that the petitioner attempted for over one year to seek help from several sources in addressing Belk's increasingly improper and threatening conduct.  However, her complaints were essentially ignored by Krok until January of 2008, when he was alerted to the fact that the petitioner had been referred to the Employee Assistance Program and also told to report the matter to the DOC's Office of Professional Responsibility.  Even after the seriousness of the petitioner's situation was recognized, Belk was allowed to continue working with her for another month and to continue his contact with her for the ensuing months.  Further, it appears that her complaint with the Office of Professional Responsibility was not given due consideration, as it was held to be without merit and without "corroboration" in the face of substantial evidence to the contrary, and in reliance upon statements by Belk which, according to the Commission, investigators understood to be false. As the DOC appeared to lack an adequate understanding of anti-discrimination law or the mechanism necessary for its enforcement, the Commission appropriately detailed steps to rectify Belk's wrongdoing, and to ensure the DOC's future compliance with the Ordinance.  We will not interfere with the Commission's discretion in

issuing the injunctive relief it did.

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court which confirmed the decision of the Commission.

¶ 55    Affirmed.