Mary Ann CRAWFORD,
Plaintiff–Appellant,

v.

MEDINA GENERAL HOSPITAL, Darla Kermendy, Kenneth Milligan, and Rex Slee, Defendants–Appellees.

No. 95–3243.

United States Court of Appeals,
Sixth Circuit.

Argued May 20, 1996.

Decided Sept. 24, 1996.

Edward L. Gilbert (argued and briefed), Akron, OH, for Plaintiff–Appellant.

Joel R. Hlavaty (argued and briefed), Richard Whelan, Thompson, Hine & Flory, Cleveland, OH, for Defendants–Appellees.

Before: RYAN and NORRIS, Circuit Judges; JOINER, District Judge.*

---

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michi-
gan, sitting by designation.

RYAN, Circuit Judge.

Mary Ann Crawford filed suit against her employer, Medina General Hospital, as well as her supervisors, Darla Kermendy, Kenneth Milligan, and Rex Slee, alleging that the defendants discriminated against her in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634, by creating a hostile working environment. She also filed supplemental state-law claims for false imprisonment and assault and battery. The district court disposed of the ADEA claim on summary judgment, reasoning that Crawford had failed to prove her *prima facie* case, and declined to exercise jurisdiction over the state-law claims.

On appeal, Crawford contends that the district court erred in granting summary judgment. For the reasons that follow, we will affirm.

## I.

The billing department at Medina General Hospital appears to have deep morale problems. To get the flavor of the situation, as well as to appreciate our resolution of the issue, requires that we burden our opinion with a rather detailed recitation of the evidence. The plaintiff, Mary Ann Crawford, began working at Medina in September 1964, when she was 28 years old. The defendant, Darla Kermendy, whose age is not apparent from the record, became Crawford's supervisor in June 1991. It is unclear what the atmosphere in the Medina billing department was like prior to Kermendy's tenure, but once she came aboard, at least Crawford became unhappy. Crawford complains that beginning with Kermendy's hire, "there were racial remarks flying, old age remarks flying, [and] the younger women would make remarks and insulting remarks." There were also "sexual remarks, filthy remarks, and [Kermendy] had a habit of putting her hands" on Crawford, apparently in an aggressive manner.

Crawford points to several "old age remarks" in support of her hostile environment claim. Crawford alleges that "Kermendy made a comment, 'I don't think women over 55 should be working.'" Crawford did not hear that remark, since she was at home ill at the time the alleged remark was made, but two coworkers told her that Kermendy "had made that remark in their presence." They told Crawford that Kermendy was talking to them about Crawford when she made the comment. Kermendy filed an affidavit countering that her comment was simply that *she* would like to retire by the age of 55, and that "[t]he comment was not directed to anyone other than [her]," as she "do[es] not care at what age anyone else may desire to retire." Her affidavit purported to explain that she wanted to retire at 55 because various family members had gotten sick shortly after attaining that age.

Next, Crawford complains that Kermendy said, within Crawford's hearing, that "[o]ld people should be seen and not heard." Crawford was "embarrassed" and "humiliated" by the comment. She does not know to whom the comment was made, because she could not actually see Kermendy at the time; she could only hear her voice, which was "[r]ude and unpleasant." Crawford, however, assumed the comment "was meant to include [her]." Crawford therefore "leaned around the file cabinet and . . . said, 'I heard that, Darla.' And she didn't respond." Crawford feels that Kermendy meant to suggest that "old people were somehow less than young people."

Crawford also generally alleges that "there were about five different girls" in the billing department "who would just constantly make . . . miserable" the lives of "the older ladies"; those five would "every once in a while" make negative comments, and "equate old with being stupid, useless, dumb." For instance, Crawford was once passing the door of a room where a group of people were having a pizza party, and one of the five looked out and saw her pass, and said, "It's just my luck in an office with an old dumb side to have to sit on that side." Crawford claims that Kermendy was in the room at the time, and "laughed and pointed and looked at [the woman making the comment]," and said "Oh, that's good." That comment apparently referred to the fact that a number of the older women sat on one particular side of the office. Crawford claims that the side was

referred to as "the old side, the dumb side, worthless side." She also claims that Kermendy "refused to walk on that side of the office for a whole day once."

In sum, Crawford asserts that the office is "totally divided" on the basis of age. She contends that in addition to verbal insults, the older women are "not included in anything," such as parties, as well as information about minor changes in office procedures. She further contends that Kermendy "calls the young people in[to Kermendy's office] and questions them about what the older people are doing, what they're saying, and then she encourages them to go out and confront those people." She claims that Kermendy "called attention" to Crawford's "extremely sensitive hearing" in a staff meeting once, and that Kermendy said that all another older worker, who had false teeth, "wanted for Christmas was her front teeth"; it is Crawford's belief that these comments are age-related.

That there was tension in the billing department is by now apparent. While it is Crawford's contention that the hostility directed at her was age-based, it is clear that Crawford treated others with hostility as well. For example, she refused to sign one coworker's birthday card, because, as Crawford explained, "I don't like her . . . because she's mean to me." She referred to one coworker as "the widow" because "she always wears black." She nicknamed one supervisor "Pat" because "at times [Crawford] feel[s] [the supervisor is] pathetic." Another coworker is nicknamed "Sluggo" because "she reminds [Crawford] of that cartoon character." Another is "Freak" because "she wears outlandish clothes and hairdos and that type of thing." She calls two coworkers "Miss Piggy," and another "fatso." Moreover, Crawford argued even with those other workers whom she considered her allies; for example, a note from one of Crawford's diaries, referring to a coworker that Crawford described as "older," reads as follows:

Ruth has gone over the other side. Tell her nothing from now on.

According to Crawford, "the other side" denoted "the people who were against the older people."

Crawford herself says that, despite the incidents complained of, and despite being "unhappy" about the way Kermendy treated her, she "liked [her] job very well." She has continued to work at Medina throughout this course of events, and has suffered no demotion or reduction in pay. But in November 1993, she filed a complaint in federal district court, alleging that she was being subjected to a hostile working environment as a result of age discrimination. Her complaint also contained state-law claims for false imprisonment and for assault and battery, based on incidents not germane to her age discrimination claim.

The district court disposed of the plaintiff's ADEA claim on summary judgment, and dismissed the supplemental state-law claims. Although holding that a hostile work environment claim was cognizable under the ADEA, the district court concluded that the plaintiff had failed to produce evidence that the alleged harassment had the effect of unreasonably interfering with her performance and creating an intimidating, hostile, or offensive work environment that seriously affected her psychological well-being. The court noted, moreover, that most of the incidents complained of by Crawford "indicate[d] hostility between coworkers rather than an age-related hostile environment."

Crawford filed a timely notice of appeal as to defendants Medina, Kermendy, and Milligan only, thus abandoning her claims against defendant Slee. See Fed. R.App. P. 3(c). We note further that the notice of appeal named one Judy Reidell; because this is an individual not named in Crawford's complaint, it is clear that Reidell is not properly a party to this appeal.

## II.

The ADEA makes it unlawful for any employer

to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, condi-

tions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). As the Supreme Court has recently explained,

[t]he ADEA, enacted in 1967 as part of an ongoing congressional effort to eradicate discrimination in the workplace, reflects a societal condemnation of invidious bias in employment decisions. The ADEA is but part of a wider statutory scheme to protect employees in the workplace nationwide. See Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1988 ed. and Supp. V) (race, color, sex, national origin, and religion); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (1988 ed., Supp. V) (disability); the National Labor Relations Act, 29 U.S.C. § 158(a) (union activities); the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (sex).... The substantive, antidiscrimination provisions of the ADEA are modeled upon the prohibitions of Title VII....

The ADEA and Title VII share common substantive features and also a common purpose: "the elimination of discrimination in the workplace."

McKennon v. Nashville Banner Publishing Co., —— U.S. ——, ——, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) (some citations omitted). Bearing the similarity of the ADEA and Title VII in mind, then, it is unsurprising that the standards, methods, and manner of proof established in Title VII case law are persuasive authority in cases arising under the ADEA, and that courts routinely employ Title VII and ADEA case law interchangeably. See, e.g., Wallace v. Dunn Constr. Co., 62 F.3d 374, 378 (11th Cir.1995) (en banc); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir.1995).

It is well-established under Title VII that an employee has a cause of action when an employer maintains a hostile working environment. The "hostile environment" cause of action was first recognized in Rogers v. EEOC, 454 F.2d 234 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), when the court held that an employee of Spanish origin had a cause of action against an employer for "the practice of creating a working environment heavily

charged with ethnic ... discrimination." Id. at 238. The doctrine has since been applied in Title VII cases alleging sex discrimination, see, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Yates v. Avco Corp., 819 F.2d 630 (6th Cir. 1987), as well as race and national origin discrimination, see, e.g., Erebia v. Chrysler Plastic Products Corp., 772 F.2d 1250 (6th Cir.1985), cert. denied, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475 (6th Cir.1989). The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises. Risinger, 883 F.2d at 485. The theoretical rationale for the doctrine is that sufficiently abusive harassment adversely affects a "term, condition, or privilege" of employment within the meaning of Title VII. See Ellison v. Brady, 924 F.2d 872, 876 (9th Cir.1991).

While, as far as we can discern, no circuit has as yet applied the hostile-environment doctrine in an ADEA action, but see Sischo–Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109 (9th Cir. 1991); Young v. Will County Dep't of Pub. Aid, 882 F.2d 290, 294 (7th Cir.1989), we find it a relatively uncontroversial proposition that such a theory is viable under the ADEA. For at least these reasons, in light of the ADEA's employment of the "terms, conditions, or privileges of employment" language, we have no doubt that a hostile work environment claim may be stated. The broad application of the hostile-environment doctrine in the Title VII context; the general similarity of purpose shared by Title VII and the ADEA; and the fact that the Title VII rationale for the doctrine is of equal force in the ADEA context, all counsel this result. We thus hold that a plaintiff may advance a hostile-environment claim under the ADEA. These are the criteria for a prima facie claim:

1. The employee is 40 years old or older;
2. The employee was subjected to harassment, either through words or actions, based on age;

3. The harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and

4. There exists some basis for liability on the part of the employer.

*Cf. Risinger*, 883 F.2d at 484; EEOC Compliance Manual § 615.7.

█ While the meaning of the first and second prongs is reasonably self-evident, the third prong is more subtle, and we must explain carefully the standard for determining when a plaintiff has produced sufficient evidence to allow a jury to conclude that the harassment is actionable, because sufficiently severe. The Supreme Court, in its initial decision on the subject, held that in order for harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (internal quotation marks and citation omitted). In a more recent case, the Court clarified that the appropriate viewpoint for determining the severity or pervasiveness is an objective one:

> This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. As we pointed out in *Meritor*, "mere utterance of an ... epithet which engenders offensive feelings in a[n] employee" ... does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. The appalling conduct alleged in *Meritor*, and the reference in that case to environments " 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers,' " ... merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

*Harris*, 510 U.S. at 22, 114 S.Ct. at 370–71. Thus, while a plaintiff must subjectively feel that an environment is hostile, and the environment must in fact be objectively hostile, it is not necessary that the plaintiff be committed to a psychiatric institution in order to have a legal complaint. The Court counseled that the totality of the circumstances be considered in applying this standard:

> [W]e can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at 23, 114 S.Ct. at 371.

█ "This court reviews grants of summary judgment *de novo* and it applies the same test utilized by the district court." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994). "A party seeking summary judgment bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Id.* "Whether harassment is sufficiently severe or perva-

sive to create an abusive work environment is 'quintessentially a question of fact.'" *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130–31 (4th Cir.1995) (citations omitted).

The plaintiff's claim fails due to her lack of proof under both the second and third prongs of the *prima facie* case. First, the plaintiff has virtually no evidence that the "harassment" of which she complains was in any way based on her age. Instead, her theory appears wholly based on a false syllogism: A) My coworkers hate me; B) I am old; C) My coworkers hate me because I'm old. The plaintiff points to only two comments that are objectively indicative of age-based animus: Kermendy's comments that she does not "think women over 55 should be working," and that "[o]ld people should be seen and not heard." Other than those two remarks, however, there is virtually no evidence, apart from Crawford's self-serving conclusions, that the hostility in the Medina workplace was in any way related to age. Unquestionably, there was hostility and abusiveness in this working environment, but the evidence suggests that the atmosphere stemmed from a simple clash of personalities. In any event, there is an absence of evidence that it stemmed from a dislike of people over a particular age. Indeed, many of the comments that Crawford asserts were age-based were, in reality, neutral. Thus, it is Crawford who insists on separating the Medina workforce into age categories; it is Crawford who consistently employs such terms as "older ladies"; and, importantly, it is Crawford who simply assumes, without objectively articulable support, that when she was insulted with age-neutral insults, it was *because of* her age.

Along those same lines, we think it is patent that we must entirely discount the plaintiff's complaints insofar as they focus on coworkers having parties without inviting her, or coworkers being surly or impolite. Even if coworkers failed to invite her to parties *because* she was over 55, it seems obvious that the ADEA was not intended to remedy minor social slights and the resulting hurt feelings. Pizza parties are simply not a term, condition, or privilege of employment of which Congress has taken cognizance.

In any event, even apart from the fact that only two comments were actually discernibly age-based, there is simply no question that the hostility at Medina, while not insubstantial, was not particularly severe or degrading. Crawford's complaints are of "mere offensive utterance[s]," as opposed to physically threatening or humiliating conduct. Saying "[o]ld people should be seen and not heard" is certainly rude, but it is not enough to create a hostile working environment within the meaning of *Harris*. Similarly, while a supervisor's opinion that women should retire at age 55 may be unenlightened and logically indefensible, and might be circumstantial evidence of age discrimination if the supervisor were later to have fired Crawford, it hardly rises even to the level of an "offensive utterance," as it is simply one person's opinion, susceptible to retort and dispute.

Finally, relatedly, Crawford has not produced any evidence tending to show that the harassment interfered with her work performance and/or created an objectively intimidating, hostile, or offensive work environment, within the meaning of *Harris*. We note there is absolutely no suggestion that the environment impeded Crawford's work performance; indeed, she herself claims to like her job, despite Kermendy's asserted abusiveness.

### III.

Because Crawford has not shown that she was subjected to harassment based on her age, or that the harassment unreasonably interfered with her work performance and created an objectively hostile environment, we **AFFIRM**.