GRIFFIN, Circuit Judge,
dissenting.
There is no Constitutional right to civility in the workplace. A supervisor may issue her subordinates performance-based critiques and at times even decline to invite them to parties at the supervisor’s home. But “discourtesy or rudeness should not be confused with racial harassment” any more than unsupported allegations should be confused with evidence. See Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1996) (brackets omitted)). My colleagues permit both substitutions in concluding Susan Przekop-Shaw subjected Sonya Bradley to a racially-hostile work environment. I disagree and would reverse the district court’s judgment. Accordingly, I respectfully dissent.
I.
The majority provides some factual background, but understanding the district court’s errors requires further context. In particular, it requires a closer examination of Bradley’s poor performance under both Przekop-Shaw and Peter Kotula—the individual who personally supervised Bradley for her last year of employment and against whom Bradley failed to muster any evidence of racial harassment. I supply those facts here.
Bradley supervised five legal secretaries in the Michigan Unemployment Insurance Agency’s (UIA’s) Detroit office and a sixth in the Grand Rapids office. She also served as personal secretary to her direct supervisor, Donna Welch (a Caucasian), the “First Assistant” in the Detroit Unit. Przekop-Shaw sat just above Welch in the chain of command as Chief of the Attorney General’s (AG’s) Labor Division. She supervised the attorneys and support staff within the UIA, including Bradley, but spent most of her time in Lansing. Defendant visited the Detroit office no more than once a week.
Shortly after beginning in the UIA, Bradley met with Welch and Przekop-Shaw to discuss her first major assignment: converting “the entire Detroit UIA office” from a manual system to the AG’s computerized system. Bradley surmised that she needed additional support staff to complete the assignment by the end of the year. According to Bradley, Przekop-Shaw “immediately demonstrated her knowledge and authority by suggesting to bring Mr. Lockman on as ‘additional AG staff ” to assist with the conversion. Bradley did not inform Przekop-Shaw of her previous encounter with Lockman, but nonetheless suspected defendant was attempting to expose her to her former harasser.
Welch left the UIA in June 2012, making Przekop-Shaw Bradley’s direct supervisor, although she still oversaw Bradley’s work from the Lansing office. Plaintiff asserts that upon becoming her direct supervisor, Przekop-Shaw “[ijmmediately ... attempted to reclassify [her] position to a *424 lower grade, but was unsuccessful.” Bradley is presumably referring to her “classification level,” which was indeed the same as colleague and fellow head secretary Amy Gonea (a Caucasian). As proof of defendant’s efforts to “lower” her grade, plaintiff points to an email Przekop-Shaw sent to Frank Russell, an official in the Human Resources Division of the Michigan Civil Service Commission. Przekop-Shaw does not mention Bradley in the email. She asks Russell if he has time to “discuss certain issues involving the UIA staff,” including how to “[r]esolve [a] mis-classification” issue. Russell asks defendant if she is referring to Bradley and to describe the issue in more detail. Defendant’s response to Russell, assuming she wrote one, is not in the record.
Bradley’s testimony sheds additional light on the misclassification issue. She explained that when she first started at the UIA, she “got a call from HR personnel ... saying that they had posted the position wrong, that it wasn’t supposed to be for division head secretary, that there was an error.” Plaintiff therefore understood that whatever inquiry defendant made about her classification was not based on race, but an error in the posting of her position.
Even so, she contends that throughout her time at the UIA, Przekop-Shaw treated Gonea more favorably and improperly permitted her to supervise Bradley. Defendant responds .that she treated Gonea like plaintiffs supervisor because Gonea was her supervisor.
The issue boiled over in November 2012, when Bradley discovered another “AG Office staff inappropriately attempted to use [her] personally issued state credit card,” which UIA employees used to pay the state’s filing fees in unemployment cases. After plaintiff noticed the discrepancy, Go-nea emailed her, asking Bradley for her card information so that Gonea could “add [it] to the Attorney General account,” Plaintiff did not respond to the email. Instead, she “elevated” the matter “to LARA and the AG[’s] Office.” “Elevated,” in this instance, means Bradley contacted LARA procurement manager LeAnn Droste and the Department of Technology Management and Budget to confirm her understanding that information concerning state-issued cards should not be shared with coworkers. “Both Ms. Droste and [the] DTMB confirmed Bradley’s interpretation.”
After the incident, plaintiff recalls that, “although in Lansing,” Przekop-Shaw “became more irate and defensive” toward her. Bradley is presumably referring to the disciplinary email Przekop-Shaw sent her for overstepping Gonea’s authority— an email Russell approved as “a good first step in taking corrective action.” Bradley attests that in a subsequent meeting, defendant was “still upset with [her] for elevating the fraudulent attempt to use [her] credit card,” and again “spitefully threatened” to transfer Lockman to Bradley’s unit.
Plaintiff sought medical leave in early 2013, giving January 17 as her leave date. However, she contends Przekop-Shaw “would make [her] jump through hoops” before leaving. On the 17th, “during numerous emails and an inappropriate racist phone call from Ms. Gonea, [Bradley] was ordered to complete a series of assignments before leaving for the day.” Bradley considered the phone call and assignments racially motivated not because of Gonea’s remarks, but because Gonea gave her additional work that prevented her from leaving at her usual time. Bradley insists— without mention of a similarly-situated comparator—that defendant “wouldn’t have” subjected- other employees to the same treatment.
*425 One of plaintiffs additional assignments was to “certify” her 2012 performance review by viewing it online. Przekop-Shaw rated plaintiff as “meet[ing] expectations” overall, but rated her as “needs improvement” in the majority of individual categories assessed. Przekop-Shaw also offered feedback and a list of specific performance objectives which Bradley described as “insulting, malicious, and disparaging.” Defendant’s remarks did not include references to race, but were critical of Bradley’s work performance.
For example, under team building, Przekop-Shaw lamented that Bradley’s working relationship with Welch deteriorated early in 2012, “usually end[ing] in disputes, exchange of disparaging remarks, and denial of responsibility for concerns being expressed.” Defendant also recalled that in a meeting with UIA attorneys, “Ms. Bradley vocally became defensive and physically launched herself over the conference table to criticize the attorney who asked her [a] question.” Further, while Bradley successfully cleared the backlog of cases in 2011, her efforts in 2012 “ha[d] diminished ... and a major backlog exists in entering cases within the Unit[’]s legal file system.” Plaintiff does not dispute these claims.
Bradley took a full eight months off, returning to work in September 2013, Upon her return, Przekop-Shaw asked a number of supervisors to prepare presentations on certain topics for the upcoming “Attorney General meeting” between the Detroit, Lansing, and Grand Rapids offices. She assigned Bradley “trust building.” “In light of [plaintiffs] recent efforts to discuss trust building at [a UIA] staff meeting,” defendant considered her “an ideal person to present this topic.” But Przekop-Shaw was displeased with Bradley’s performance.
During her presentation, Bradley acknowledged the work of her Detroit secretaries, but “deliberate[ly] omitted” mention of the Grand Rapids secretary she supervised remotely. She also “use[d] her alleged workload as an excuse for not completing [her] assigned projects on time.” “It was inappropriate for you to reference your workload as the reason that support staff ‘volunteers’ to assist you,” defendant told Bradley. “[T]his reference inappropriately telegraphed to other support staff ... that they have an obligation to volunteer to assist you.” Further, Bradley encouraged her staff to “be forth right” when they felt someone treated them rudely “and advise the person why they’re being rude.” Finally, plaintiff asked Przekop-Shaw to agree that the Unit’s support staff was performing well, which Przekop-Shaw felt inappropriate given plaintiff’s awareness of management’s “ongoing concerns with the support staff’s performance.” Defendant issued plaintiff a “formal counseling” memo for the presentation.
Bradley states that “[f]rom that date forward, Przekop-Shaw consistently criticized [her] performance at staff meetings, in front of her staff, and in public.” Plaintiff offers no citation for this claim. And the single instance of criticism the district court seized upon—a .meeting in which plaintiff was told to “Put [her] big girl panties on”—was leveled at Bradley by another African-American employee from the Human Resources Division. Plaintiff does not allege Przekop-Shaw took part in, or had any role in influencing, this meeting.
In December, each UIA office hosted its own holiday party. But Przekop-Shaw limited festivities in the Detroit office. According to one of plaintiffs coworkers, defendant informed the mostly African-American Detroit unit that they “were not allowed to have a holiday luncheon as we *426 usually do.” “[I]f we did have one it could only be 1 hour which has to be our lunch hour. Well we later found out that Ms. Przekop-Shaw gave a holiday luncheon at her home,” with only “her Lansing staff (all white)” in attendance.
Defendant issued Bradley her 2013 performance review in February 2014. Przek-op-Shaw rated plaintiff as “needs improvement” overall. She noted that Bradley failed to complete a draft of an “operational procedure manual” for UIA staff, a project Welch assigned to her in 2012. Plaintiff also submitted an incomplete draft of a secretarial procedures manual. Her monthly reports included inaccuracies that inhibited the work of other staff members. And while the AG had “substantially] change[d]” the UIA’s procedures in April 2012, Bradley still instructed her staff to follow its former procedures. Finally, Bradley sent “emails questioning] her supervisor’s directions or challenging] the Section Head or the Division Head Secretary’s role in assuring proper performance of the unit.” Again, Bradley does not contend these criticisms are inaccurate.
Defendant recommended to the Human Resources Division that plaintiffs performance may improve under daily supervision. The AG’s office and the Human Resources Division agreed and assigned Kotula as Bradley’s Detroit-based supervisor. Under Michigan’s Civjl Service rules, a “needs improvement” rating triggers a performance improvement plan (PIP), so Kotula developed a PIP for plaintiff with input from Przekop-Shaw and Russell.
The March 2014 PIP required plaintiff to maintain a daily log of activity, develop and finalize the procedural operations and secretarial procedure manuals, and meet her assignment deadlines—or communicate with Kotula ahead of time if a task could not be completed within the allotted time. It also called for overall “improvement in communication and leadership skills,” including “following directives and communicating professionally to build positive relationships with leadership, co-workers, and staff.”
Bradley did not satisfy these requirements. Within the same month Kotula placed her on a PIP, plaintiff refused to follow instructions from the new “First Assistant” Debbie Taylor to “have [her] staff sign in to their computers using their established user ID and log in” information. Plaintiff told Taylor she would not comply with the direction “until [she] had received those instructions in writing.” Ko-tula issued plaintiff a formal counseling memo for the incident. Later, he placed plaintiff on an “Interim Employee Rating,” providing notice that she had not complied with the terms of her PIP.
Kotula issued plaintiff two more formal counseling memos in November 2014. The first focused on emails Bradley sent while she was out of the office, which Kotula considered “either confusing,” or “completely inappropriate.” The second warned plaintiff of her “ongoing failure to meet the performance expectations set forth” in her PIP. This counseling memo accompanied plaintiffs “Interim Rating Progress Review”—in which Kotula concluded that plaintiffs overall performance remained unsatisfactory. Detailing the reasons for the rating, Kotula stated: “You have been disruptive and inappropriate at managerial staff meetings.... Additionally, you have demonstrated an inability or unwillingness to meet established deadlines. You often fail to respond to the members of your management team when they inquire about the status of an assignment given to you or a missed deadline.” “Cases are not being opened timely, and assigned tasks are not tracked or completed in a timely manner.” Moreover, “in response to inquiries concerning the status of work as *427 signed to [her],” plaintiff “forwarded numerous files to the Lansing office so that staff there could complete tasks which are [her] responsibility.”
Kotula reviewed plaintiffs performance again in December 2014. He concluded Bradley’s work was still lacking and issued her a fifth formal counseling memo listing the deficiencies. For example, Bradley understood, but was not using, the “Sections email assignment system” to track her assignments, making it difficult for others who were using the mandated system to find her work. Bradley also declined to instruct her staff regarding certain “assignment protocols,” which “in her opinion, [were] not part of her printed directions and procedures.” Her productivity issues also persisted—the Detroit office had to transfer a number of Bradley’s case files to Lansing after plaintiff failed to open them in a timely manner. Of the 130 email assignments generated in the UIA between October 30 and November 14, Bradley’s staff completed only 82. “Ms. Outwa-ter accounted for 77 assignments; Ms. Jackson reported 5 completed assignments; and Ms. Bradley reported 0 completed assignments.” Kotula subsequently extended plaintiffs Interim Rating Period through March 2015.
By February, he issued Bradley two more formal counseling memos. Again, the first involved plaintiffs email communications, specifically, an email she sent Kotula concerning Taylor. In it, Bradley explained that Taylor “seems to be creating new work protocols that are just the opposite of past practices” and sought Kotula’s assistance in correcting her. “Furthermore,” she added, “Ms. Taylor recently suggested that if I place documents in my work area ... that may be in her viewing sight, she will take or even destroy them.” Kotula deemed the email “inappropriate,” “accusatory,” and “unprofessional.”
Kotula issued the second February counseling memo in conjunction with plaintiffs second unsatisfactory Interim Rating Progress Review. The memo spells out the occasions wherein Bradley failed to complete her assignments, communicated in an inaccurate or unprofessional manner, or did not follow instructions. After a final meeting to discuss her performance in March 2015—which Przekop-Shaw did not attend—the UIA terminated Bradley’s employment.
II.
I agree with the majority on a few basic points. First, we have jurisdiction to decide whether, under the facts presented, Prez-kop-Shaw violated plaintiffs clearly established right to be free of a racially-hostile work environment. Williams v. Mehra, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc); see also Risinger v. Ohio Bureau of Workers’ Compensation, 883 F.2d 475, 479 (6th Cir. 1989); Poe v. Haydon, 853 F.2d 418, 428-29 (6th Cir. 1988). Second, I agree this case turns primarily on the third and fourth elements of plaintiffs claim— whether Przekop-Shaw harassed Bradley based on race, and whether, the harassment created an abusive work environment. Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 511 (6th Cir. 2011). I disagree, however, with the majority’s application of the summary judgment and hostile work environment standards.
Our “duty to view the facts in a light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence.” Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009). “To make out' a genuine issue of material fact, [the] plaintiff must present significant probative evidence tending to support her version of the facts, evidence on which a reasonable jury could return a verdict for *428 her.” Id. at 913, Qualified-immunity plaintiffs are no exception. Id. Bradley’s evidence must also be specific. See Matsushita Elec. Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). She cannot defeat defendant’s motion by “replac[ing] concluso-ry allegations of the complaint ... with [the] conclusory allegations of an affidavit.” Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).
Further, to succeed on her substantive claim, the complained of conduct must be objectively hostile. “Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII’s purview.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 296 (1993).[1] Title VII does not create a “general civility code” for the American workplace, Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (citation omitted), and neither does § 1983 in its place, Arendale v. City of Memphis, 519 F.3d 587, 606 (6th Cir. 2008). As a result, we have said that “minor social slights” like the failure to invite an employee to a holiday party—even if based on race—“must [be] entirely discounted].” See Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) (addressing failure to invite the plaintiff to office pizza parties in the age-discrimination context).
Bradley has not made either showing. First, her claims of racial harassment are unsupported and, at times, even contradicted by the record. Second, her allegations are insufficient to establish a racially hostile work environment as a matter of law. The district court therefore erred in denying Przekop-Shaw’s motion for summary judgment.
In reaching the opposite conclusion, the majority relies on three incidents the district court cited in finding a genuine issue of material fact: (1) that defendant, on two occasions, threatened to transfer Lockman to Bradley’s work area; (2) that defendant treated Bradley “substantially different” than Gonea; and (3) that defendant treated the African-American staff in the Detroit office less favorably than the mostly Caucasian Lansing staff because she neglected to invite them to a party. Additionally, the majority credits plaintiffs broad assertion that Przekop-Shaw: (4) “attempted] to downgrade her position[,] ... berated her work performance, arbitrarily placed her on performance-improvement plans, [issued her] groundless counseling statements for asking for assistance, fail[ed] to meet with her to discuss her work performance, required] her to complete unrealistic work assignments before taking annual leave, and den[ied] her comp-time”—a run-on claim which appears in plaintiffs brief without citation to the record. I address each in turn.
A.
Przekop-Shaw’s threats to transfer Lockman. Bradley attests that defendant twice threatened to transfer Lockman, the attorney who made a racially-charged comment toward Bradley, to Bradley’s unit. Yet these threats can be taken as proof of race-based mistreatment only if Przekop-Shaw knew of Lockman’s harassing behavior. Plaintiff presents no evidence that she did.
*429 Defendant testified she “had no knowledge of any interaction between Mr. Lock-man and Ms. Bradley” before Bradley filed her complaint. Nothing in Bradley’s affidavit (from which the majority takes most of its facts) suggests otherwise. Plaintiff did not attest, for instance, that she told Przekop-Shaw about Lockman’s remark. In fact, she did not attest, testify, or claim in her brief that she informed anyone of Lockman’s harassment at any time. Nor does her amended complaint include facts permitting an inference that defendant knew of the harassment. Indeed, this was one of the reasons the district court dismissed her disparate treatment claim against defendant on the pleadings:
Plaintiff alleges that Defendant Przek-op-Shaw “became enraged with Plaintiff and spitefully threatened to transfer Mr. Lockman to the section in effort [sic] to intimidate Plaintiff and allow him to continue to harass and bully Plaintiff if she did not stop complaining of issues in the office and ‘disobeying her.’ ” This, also, is a conclusory allegation, as Plaintiff does not indicate that Defendant Przek-op-Shaw even knew of the alleged racial statement made by Mr. Lockman.
“Accordingly,” the district court could not “even draw the inference” that defendant’s reference to Lockman “was a spiteful threat of intimidation and harassment.” Neither can I.
When asked at oral argument what evidence supports her assertion that defendant knew of Lockman’s harassment, plaintiffs counsel explained that another unnamed. employee, who he declined to depose, reported the incident to “the AG’s Office.” My colleagues agree he “could not point to evidence in the record” demonstrating that Bradley, or anyone else, “elevated” the harassment issue to “senior leadership” in the Attorney General’s office (whoever that may be).[2] Still, Bradley implies defendant must have known about Lockman’s conduct because “Przekop-Shaw and Mr. Lockman worked together in the Attorney Generalas] Office.” Bradley offers no record citation for this claim because there is no evidence they did.
Taking plaintiffs unproven allegations as evidence is a running theme for the majority. It concludes Bradley can create a genuine issue of fact by questioning the validity of defendant’s evidence, without presenting her own “affirmative evidence” “sufficient to allow a jury to return a verdict in [her] favor.” Wimbush v. Wyeth, 619 F.3d 632, 638 n.4 (6th Cir. 2010). “[T]his is precisely the argument" the Supreme Court “rejected in Celotex.” Harvey v. Campbell Cty., 453 Fed.Appx. 557, 560 (6th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). “Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying” the proofs “which it believes demonstrate the absence of a genuine issue of material fact.” Celotex, 477 *430 U.S. at 323, 106 S.Ct. 2548. But once the movant discharges this responsibility, the nonmovant bearing the burden of proof at trial must respond. She must “go beyond the pleadings and by her own affidavits, or by [other evidence] on file, designate specific facts showing there is a genuine issue for trial.” Id. at 324, 106 S.Ct. 2548 (internal quotation marks omitted). Bradley has not designated any such facts.
Plaintiff may believe defendant was aware of the harassment at the time she “spitefully threatened to transfer” Lock-man, but her belief is based on suspicion alone; no record-supported facts permit this inference. If we cannot reasonably infer that Przekop-Shaw knew of Lock-man’s harassment, we likewise cannot reasonably infer that she threatened to transfer him to plaintiffs unit on account of plaintiffs race. See Williams, 643 F.3d at 511 (facially neutral conduct qualifies as race-based harassment only if “it would not have occurred but for the plaintiffs race”). Accordingly, these threats do not carry any weight in the hostile work environment inquiry.
Przekop-Shaw’s more favorable treatment of Gonea. The majority next concludes “[t]here is evidence in the record” to support Bradley’s claim that Przekop-Shaw treated her less favorably than Go-nea—and there is, although it does not rebut defendant’s motion for summary judgment.[3]
Przekop-Shaw testified that, despite their shared classification, Gonea and Bradley were “[n]ot in the same department.” Whereas plaintiff served as the head secretary of the UIA, a unit within the AG’s Labor Division, Gonea served as the head secretary of the Labor Division-“charged with overseeing all secretarial functions” within its units. In that sense, Gonea was part of the secretarial management team and above Bradley in the chain of command. Defendant explained this to Bradley, although Bradley was unhappy with the arrangement. Plaintiffs dislike of her employer’s governing structure is not proof of a hostile work environment.
Rather than engage with defendant’s testimony, the majority points to an email in which Frank Russell observed that Bradley must have been upset at “having to abide by a peer’s ([Gonea’s]) direction.” But Russell’s statement taken as a whole does not create a question of fact. The email in question is Russell’s response to the disciplinary email Przekop-Shaw sent plaintiff after plaintiff ignored Gonea’s request for her government-issued credit card information. Przekop-Shaw consulted with Russell before emailing Bradley because she had to obtain his approval before issuing any discipline. While Russell identifies Gonea as Bradley’s peer, he explicitly reiterates his approval of Przekop-Shaw’s decision to discipline Bradley for ignoring Gonea’s directions—confirming defendant’s testimony that Gonea was, in fact, *431 Bradley’s supervisor. “This would have been a good first step in taking corrective action,” he states. “The content of your email expressing your concerns would have been perfect for a Formal Counseling Memorandum.” Thus, Russell agreed with defendant’s warning to plaintiff: that Bradley, as “a section head secretary,” does not “trump the Division head secretary’s authority.”
Unsatisfied with this evidence, the majority concludes that a jury should decide whether Przekop-Shaw treated Bradley differently “due to an error in Bradley’s classification level or [due] to racial animus.” I disagree. For one, my colleagues appear to assume that Gonea’s equal classification precludes her from being plaintiffs supervisor. Nothing in Russell’s email (or the record) suggests that supervision of one employee by another of the same classification is improper, or contrary to Michigan Civil Service protocol. If anything, Russell’s decision to approve the discipline while knowing that Gonea and plaintiff have the same classification suggests just the opposite—that classification is not indicative of supervisory status.
For another, to the extent my colleagues require proof that plaintiff should have been classified at a lower level before Go-nea could supervise her, they have it. Bradley testified that when she was first hired, “HR personnel” informed her that they had “posted [her] position wrong” with an incorrect classification level. Plaintiffs admission is further proof that she did not “trump” Gonea’s authority.
Ultimately, plaintiffs only counter to defendant’s explanation is her assertion that “Ms. Gonea was not in Bradley’s chain of command.” She gives no record citation for this claim, and the evidence does not support it. Defendant’s treatment of plaintiffs supervisor as her supervisor is not race-based conduct. This claim does not weigh in the hostile work environment analysis.
Przekop-Shaw’s mistreatment of the Detroit staff. This claim is based on one event: Przekop-Shaw’s failure to invite the majority African-American staff from the Detroit office to a party she hosted at her home for the majority Caucasian staff from the Lansing office. Because employees in the Detroit office are predominantly African American, (and because plaintiff submitted evidence to support this assertion), one can infer this was a race-based exclusion. This event—and only this event—is therefore a part of the circumstances considered in the hostile work environment inquiry.
“Isolated incidents, however, unless extremely serious will not amount to discriminatory changes in the terms or conditions of, employment.” Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000). Denying staff an invitation to a holiday party is rude. But “extremely serious” it is not. See Crawford, 96 F.3d at 836 (describing exclusion from office parties as a “minor social slight[ ]”). Plaintiff must therefore point to further race-based conduct to demonstrate her workplace was the type “a reasonable person would find hostile or abusive.” Bowman, 220 F.3d at 463. As explained, she has not.
Other claims against Przekop-Shaw. Plaintiffs remaining list of grievances, that Przekop-Shaw “attempted] to downgrade her position[,] ... berated her work performance, arbitrarily placed her on performance-improvement plans, [issued her] groundless counseling statements for asking for assistance, fail[ed] to meet with her to discuss her work performance, required] her to complete unrealistic work assignments before taking annual leave, and den[ied] her comp-time,” are alleged in her brief without citation to the record. *432 This alone is reason enough to reject them. But, on top of that, there are others.
First, plaintiff has not shown that Przek-op-Shaw was even responsible for things like “comp-time,”[4] and it is undisputed that Kotula, not Przekop-Shaw, issued the majority of plaintiffs “performance-improvement plans” and “counseling statements.” In a constitutional action against defendant in her individual capacity, see 42 U.S.C. § 1983, this is a dispositive oversight. “When suing an individual actor, such as [Przekop-Shaw], for constitutional violations under § 1983, a plaintiff must demonstrate that the actor ‘directly participated’ in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out h[er-]self.” Flagg v. City of Detroit, 715 F.3d 165, 174 (6th Cir. 2013) (quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)). That is, a defendant accused of unconstitutional discrimination must be “personally involved in the alleged misconduct” to be personally liable for it. Foster v. Michigan, 573 Fed.Appx. 377, 394 (6th Cir. 2014) (quoting Miller v. Calhoun Cty., 408 F.3d 803, 817 n.3 (6th Cir. 2005)).
Complicating this issue further, my colleagues imply that defendant can be held liable for the negative reviews Bradley received from Kotula, because “subsequent negative performance .reviews often cite failure to improve on issues raised in prior reviews,” creating a “compounding effect” over time. But insofar as there is a legal theory under which Przekop-Shaw can be held responsible for Kotula’s decisions, § 1983 is not it, “Under § 1983, there is no respondeat superior or vicarious liability,” which is precisely why Bradley must establish defendant’s “direct[ ] participation]” in order to win a judgment against her. Flagg, 715 F.3d at 174 (citation omitted).[5] For some of these concluso-ry allegations, plaintiff has failed to make this showing.
Second, a number of Bradley’s claims mischaracterize the record, starting with the assertion that defendant “attempted] to downgrade” her position. Plaintiffs evidence does not demonstrate this event actually happened. She points to the email exchange between Przekop-Shaw and Russell in which defendant asks about employee “misclassification,” but does not mention Bradley, much less ask that she be “downgrade^].” The majority rightly notes “[i]t does not appear from the record that any change was made,” but it is more accurate to say “it does not appear from the record that any change” was even re *433 quested. Further, it is undisputed that Przekop-Shaw’s inquiry to Russell was not racially motivated; Bradley acknowledged her position classification had been posted in error.
The record also belies plaintiffs suggestion that Przekop-Shaw prevented her from taking leave. During her four years at the UIA, Bradley took approximately nine months of leave—eight of which Przekop-Shaw approved while Bradley was under her immediate supervision. While the majority omits this fact, I cannot. Determining whether a genuine issue of fact exists requires “addressing all the facts in the record—including those that uniformly cut against the plaintiff.” EEOC v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015) (en banc). That Gonea, and not defendant, gave Bradley additional work to do before leaving for the day is not proof of racial harassment absent evidence that defendant treated persons outside the protected class differently, and Bradley offers none.
An even greater mischaracterization is the implication that Przekop-Shaw’s critiques of Bradley’s work performance were unjustified. Plaintiff at no point disputes the factual accuracy of the criticism she received from defendant or Kotula—and indeed, seems to concede that she failed to complete assignments in a satisfactory or timely manner.[6] “Without more,” negative performance assessments—particularly those based on merit rather than protected status—“cannot ‘create an envh’onment that a reasonable person would find hostile or abusive.’ ” El-Zabet v. Nissan N. Am., Inc., 211 Fed.Appx. 460, 464 (6th Cir. 2006) (quoting Smith v. Leggett Wire Co., 220 F.3d 752, 760 (6th Cir. 2000)).
The majority does not dispute that defendant carried her burden to “inform[] the court of the basis for [her] motion” and identify evidence “which [she] believes demonstrates the absence of a genuine issue of fact.” Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Nevertheless, it insists we must accept Bradley’s facts as true unless they are “blatantly contradicted” or “utterly discredited by the record.” (Maj. Opn. (quoting Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007))). Some of them are. But more to the point, before we can accept Bradley’s facts as true, plaintiff must step forward with a record-supported' version of the facts in the first instance. She has not.
“A plaintiff cannot simply sit back and highlight deficiencies in the defendant’s argument without providing some affirmative support for [her] own position.” Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 533 (6th Cir. 2012). Nor can she simply move the eonclusory allegations of her complaint into a eonclusory affidavit. Lujan, 497 U.S. at 888, 110 S.Ct. 3177. She must “make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue of material fact exists, and that a trial is necessary.” Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009).
*434 Here, a trial is not necessary. At most, plaintiff has shown that defendant neglected to invite her and other African-American employees to a holiday party at her home. This is a “minor social slight[ ]”; not a racially-hostile work environment. Crawford, 96 F.3d at 836. “[Holiday] parties are simply not a term, condition, or privilege of employment of which Congress has taken cognizance.” Id. The district court erred in concluding otherwise.
B.
Our court “has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory.” Phillips v. UAW Int’l, 854 F.3d 323, 328 (6th Cir. 2017). Bradley’s claims do not reach it.
The behaviors that typify a racially-hostile work environment are not subtle. Most cases do not include “minor social slights” like denying an employee an invitation to a party. Crawford, 96 F.3d at 836. They instead include supervisors’ routine use of the N-word and other racist terms, graffiti referring to t|ie “KKK” and depicting lynchings in common areas, the award of stickers for firing minority workers, vandalism to personal property with racial epithets, denial of promotions to and disproportionate discipline of African-American employees, display of a swastika, and even physical assault. See Jackson v. Quanex Corp., 191 F.3d 647, 651-56 (6th Cir. 1999); see also e.g., Jordan v. City of Cleveland, 464 F.3d 584, 597-98 (6th Cir. 2006) (a reasonable jury could find a hostile work environment where, “for more than a decade,” the plaintiff was subject to “confrontational and caustic behavior,” “various racial slurs, demeaning jokes and inflammatory graffiti,” “isolation and segregation,” and “disparate discipline and additional duties”). Hanging nooses, drawing offensive caricatures, and employee refusal to respond to sensitivity training may also evince a workplace so “permeated with discriminatory intimidation, ridicule and insult,” no reasonable person could tolerate it. Harris, 510 U.S. at 21, 114 S.Ct. 367; see, e.g., Bailey v. USF Holland, Inc., 526 F.3d 880, 882-84, 887 (6th Cir. 2008) (detailing such facts). While no list is exhaustive, the deeply offensive nature of the foregoing acts underscores what the Supreme Court “made ... clear” in Faragher: “conduct must be extreme to amount to a change in the terms and conditions of employment.” 524 U.S. at 788, 118 S.Ct. 2275.
Plaintiffs events are not extreme. Even if she could prove them, the three incidents the district court cited in finding an issue of fact—that defendant (1) twice threatened to transfer Lockman to her work area; (2) treated Gonea more favorably; and (3) denied plaintiff and other African-American staff an invitation to a party at her home—are well beneath the “relatively high bar” the case law demands. Phillips, 854 F.3d at 328. Certainly, no reasonable actor in Przekop-Shaw’s position would have known that her conduct was on par with those who routinely use racial slurs, deface personal property with racial epithets, hang nooses, or physically assault employees. See Chappell, 585 F.3d at 907 (“Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful.”).
Nor are plaintiffs events objectively severe or pervasive. Przekop-Shaw was plaintiffs immediate supervisor for approximately twenty-two months (eight of which plaintiff took off with Przekop-Shaw’s approval). In that time, and throughout plaintiffs four years at the UIA, the parties agree that Przekop-Shaw generally visited the Detroit office no more *435 than once a week.[7] A supervisor may be able to harass her subordinates from a remote location, but her capacity to “permeate! ]” the workplace with “discriminatory intimidation, ridicule, and insult” severe and pervasive enough to alter the conditions of their employment is likely diminished by such distance, Harris, 510 U.S. at 21, 114 S.Ct. 367. This is so because “the actionable wrong” in a hostile work environment claim “is the environment, not the individual acts that, taken together, create the environment.” See Clay v. United Parcel Service, 501 F.3d 695, 707-08 (6th Cir. 2007) (citation, omitted) (affirming the district court’s finding that “fifteen specific incidents spanning a two-year period were isolated and were not pervasive”). An environment is fundamentally holistic. It does not “occur on any particular day,” but is marked by repeated conduct occurring “over a series of days or perhaps years.” Morgan, 536 U.S. at 115, 122 S.Ct. 2061. A supervisor has less impact on its character when she is not physically present there for “a series of days” at a time.
III.
Applying the appropriate standards, Bradley has not shown that defendant subjected her to an environment so “permeated with discriminatory .intimidation, ridi-' cule, and insult” that a reasonable person would find it intolerably hostile or abusive. Harris, 510 U.S. at 21, 114 S.Ct. 367. Nor has she demonstrated that a reasonable officer in Przekop-Shaw’s position would have known that her conduct created such an environment. For these reasons, I would reverse the district court’s denial of qualified immunity and remand for entry of summary judgment in favor of defendant. I respectfully dissent.

. “This Circuit has held that the required elements of prima facie proof necessary for a plaintiff charging a racially hostile work environment under both Title VII and 42 U.S.C. § 1983 are the same.” Boutros v. Canton Reg'l Transit Auth., 997 F.2d 198, 202 (6th Cir. 1993).

. Counsel also argued that we can infer defendant’s inappropriate intent because Lock-man is an attorney and, therefore, reasons the majority, "was not in a position to alleviate the workload of the secretarial staff, nor would transferring him to Bradley's unit have been a legitimate response” to Bradley’s credit card complaint. Such an inference is supportable only if we assume plaintiff's theory is true—that Przekop-Shaw knew Lockman had harassed Bradley, We cannot make this assumption because, as even the majority agrees, there is no evidence she did. Bradley’s characterization of Przekop-Shaw’s demeanor as “spiteful[]” and “upset” (made in an affidavit, not in testimony, as the majority states) is not proof that Przekop-Shaw knew of the harassment. One does not ”lose[] sight of [one’s] obligation to credit Bradley’s testimony” when that testimony does not, in fact, support her claims of defendant’s knowledge,

. The majority points to two "affidavits of former co-workers ” who claimed to witness defendant’s mistreatment of Bradley. The first states, without context: "Ms. Przekop-Shaw with the help of [several subordinates] totally stripped Ms. Bradley of all her authority, and Ms. Bradley was treated as if she was not a part of management yet Ms. Gonea who is the same classification of Ms. Bradley was not stripped of any authority.” The second states: "Ms. Bradley was treated differently than her white colleague Ms. Amy Gonea,” and "Amy Gonea treated Ms. Bradley as a subordinate instead of a co-worker and was disrespectful.” Affidavits like these, consisting of "vague, conclusory allegations” and subjective beliefs are insufficient to withstand a motion for summary judgment. Hartsel v. Keys, 87 F.3d 795, 803-05 (6th Cir. 1996); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 584-85 (6th Cir. 1992).

. I note, moreover, plaintiff failed to demonstrate that she was denied comp-time based on race. When asked whether she could name a comparable employee who was granted overtime or "comp-time” when defendant denied it to her, Bradley identified another African-American employee, working under a different supervisor, in a different department.

. The majority’s related claim—that "Przek-op-Shaw’s favorable treatment of Gonea at the expense of Bradley became a substantial factor in the series of reviews that culminated in Bradley's dismissal”—is inaccurate. Again, Kotula supervised Bradley, gave her assignments, assessed her performance, and recommended her termination during her last year of employment. There is no evidence Przekop-Shaw was involved in the decision to discharge Bradley. Termination, moreover, is a "[discrete act,” which is a "separate actionable 'unlawful employment practice’ ” distinct from a hostile work environment claim, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). And plaintiff lost on this claim. The district court dismissed her disparate treatment action at the pleading stage because, again, Bradley offered only "conclusory assertions" with "no facts to support” them, Plaintiff did not cross-appeal this ruling; resurrecting the claim on her behalf is improper and beyond the scope of our jurisdiction.

. Bradley instead argued defendant made her job impossible by assigning her an unreasonable number of tasks and denying her the resources necessary to get the job done. However, this claim is inaccurate. Management granted plaintiff's request to hire an additional secretary, as well as a word processing assistant in 2011, not long after Bradley started. By the time defendant became Bradley’s supervisor in 2012, it is not clear that she had authority to grant Bradley’s request for additional staff. Plaintiff acknowledged the UIA could not hire temporary assistants without approval from LARA and had reduced its budget and cut staff at the AG’s orders. And there is no evidence defendant provided employees outside the protected class the assistance she allegedly denied to plaintiff.

. The majority’s claim that defendant and plaintiff had "daily interactions” is incorrect. Bradley and Przekop-Shaw were often not even in the same office. Even plaintiff agrees "[i]t should be noted that Przekop-Shaw worked primarily in the Department's Lansing office, visiting Detroit approximately one day per week.”